UNITED STATES BANKRUPTCY COURT        **FOR PUBLICATION**
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
In re:                                       :
                                          :
         DREIER LLP,                        :         Chapter 11
                                          :         Case No. 08-15051 (SMB)
                 Debtor.              :
-------------------------------------------------------------X
SHEILA M. GOWAN, Chapter 11 Trustee    :
For the Estate of Dreier LLP,               :
                                          :
                Plaintiff,           :
                                          :
            –against–             :
                                          :
WESTFORD ASSET MANAGEMENT LLC,    :
SGS ASSET MANAGEMENT, STAFFORD    :        Adv. Proc. No. 10-5447
TOWNE, LTD., BENNINGTON             :
INTERNATIONAL HOLDINGS, LTD.,       :
WESTFORD SPECIAL SITUATIONS MASTER   :
FUND L.P., ADAMS INTERNATIONAL      :
TRADING, LTD., CARSTON SPIRES, LTD.,   :
WESTFORD GLOBAL ASSET             :
MANAGEMENT LTD., EPSILON GLOBAL      :
MASTER FUND, LP, EPSILON GLOBAL       :
MASTER FUND II, LP, WESTFORD SPECIAL   :
SITUATIONS FUND, LTD., EPSILON        :
DISTRESSED STRATEGIES MASTER FUND,   :
LP and STEVE STEVANOVICH,          :
                                          :
                Defendants.       :
-------------------------------------------------------------X

**MEMORANDUM DECISION GRANTING IN PART AND DENYING
IN PART MOTION TO DISMISS AMENDED COMPLAINT**

**A P P E A R A N C E S**

DIAMOND McCARTHY LLP
Attorneys for Plaintiff
620 Eighth Avenue, 39th Floor
New York, NY 10018

      Howard D. Ressler, Esq.
      Stephen T. Loden, Esq.
      J. Benjamin King, Esq.
        Of Counsel

JONES DAY
Attorneys for Defendant
222 East 41st Street
New York, NY 10017

      Steven C. Bennett, Esq.
      Michael D. Silberfarb, Esq.
      Tobias S. Keller, Esq.
          Of Counsel

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge**

      The plaintiff, the chapter 11 trustee of the estate of Dreier LLP ("Dreier LLP"), commenced this adversary proceeding to avoid and recover fraudulent transfers aggregating $137,648,574. The defendants (collectively "Westford") are an affiliated group of hedge funds (and their agents and managers) that invested in Marc S. Dreier's ("Marc") self-confessed criminal Ponzi scheme. The plaintiff also seeks to equitably subordinate the defendants' claims and impose liability under general partnership law against the general partner of one of the defendants.

      Westford has moved to dismiss the Amended Complaint for failure to state a claim upon which relief can be granted (the "Motion"). *See* FED. R. CIV. P. 12(b)(6). Its principal argument is that the fraudulent transfer allegations should be dismissed because the face of the Amended Complaint reflects that it received all of the transfers in good faith and paid value. For the reasons that follow, the Motion is granted in part and denied in part.

# BACKGROUND

**A.      The Ponzi Scheme**

Prior to the petition date, Marc orchestrated a scheme pursuant to which he sold fraudulent promissory notes (the "Solow Notes") to investors.  (¶ 27.)[1]  Marc falsely told most potential investors that a long-standing Dreier LLP client, Solow Realty and Development Corp. ("Solow"), was interested in borrowing millions of dollars to fund Solow's purchase of unspecified real estate investments.  (¶ 27.)  The Solow Notes allegedly bore above-market interest rates and terms extremely favorable to investors.  (¶ 27.)  A classic Ponzi scheme, Marc used the proceeds obtained from later note purchasers to pay off the principal and interest owed to prior note purchasers.  (¶ 27.)

To induce investments, Marc delivered "information packages" and other documents that contained peculiarities and irregularities, and should have raised eyebrows.  For example, Marc delivered fake Solow financial statements and audit opinion letters on the letterhead of Berdon LLP ("Berdon"), who was unaware of the situation.  (¶ 28.)  Although the financial statements were supposedly "consolidated," they did not identify the entities that were being consolidated.  (¶ 29.) The fake financial statements also showed that Solow had hundreds of millions of dollars in cash and liquid assets on hand.[2]  It was implausible that Solow would take on relatively small amounts of debt at above-market interest rates to supplement liquid assets that were already sufficient to fund further real estate investments.  (¶ 31.)

---

[1]      The parenthetical reference "(¶)" refers to the paragraphs in the Amended Complaint, dated Apr. 7, 2011 (ECF Doc. # 14).  Unless otherwise indicated, citations to "ECF" refer to the electronic docket in this adversary proceeding.

[2]      For example, the fake financials indicated that Solow had $386,937,000 in net income for 2003 and $615,205,000 in net income for 2004.  (¶ 42.)

In addition, the "Term Loan Agreements" that the investors were required to execute contained unusual features. To begin with, Solow agreed to be bound by anyone who represented himself to be acting as Solow's agent:

> The Borrower hereby authorizes the Lender to rely upon the telephone or written instructions of any person identifying himself or herself as an authorized officer of the Borrower and upon any signature which Lender believes to be genuine, and the Borrower shall be bound thereby in the same manner as if the officer were authorized or such signature were genuine.

(¶ 32.)

Moreover, the Term Loan Agreements directed investors to deal only with Marc, and all legal notices, billing statements, payments or communications of any kind required under the notes were to be sent to Marc's attention at "Solow Management Corp c/o Dreier LLP." (¶ 33.) According to the Amended Complaint, transaction documents often require the parties to copy counsel on communications, but it is unusual for such documents to direct communications only to counsel, without a copy sent to the client. (¶ 33.) Finally, investors wired payments to and received payments from the "Dreier LLP Escrow Account" (the "5966 Account"). (¶ 34.)

## B.    Westford's Participation

As noted, Westford consists of a group of affiliated hedge funds, their agents and managers. (*See* ¶¶ 7-19.) Steve Stevanovich was the founder, president and manager of Westford Asset Management LLC ("WAM"), (¶ 7), and investment manager for the Westford Investment Funds that was eventually succeeded or supplanted by SGS Asset Management ("SGS"), which Stevanovich also founded. (¶ 8.) Stevanovich, through WAM and SGS, directed Westford's participation in the transactions that are the subject of this adversary proceeding. (*See* ¶¶ 8, 19.)

Westford was introduced to the scheme by Kosta Kovachev. Kovachev served as the scheme's broker and received a commission from Marc if he found purchasers for the fraudulent

4

notes, a fact Westford knew.  (¶ 36.)  On or before December 31, 2003, Kovachev spoke to WAM employee George Zombek regarding a potential loan to Solow.  (¶ 37.)  The plaintiff believes that Westford expressed interest, and Kovachev provided Zombek with information on Solow, and served as an intermediary between Westford and Marc in the exchange of the initial transaction documents.  (¶ 37.)

Kovachev's involvement should have given Westford pause.  Public information available at the time revealed that Kovachev was defending a securities fraud complaint brought by the SEC that accused Kovachev of participating in a $28 million "boiler-room" Ponzi scheme that marketed fake timeshares to the elderly, and involved the preparation of forged documents used to dupe investors.  According to the SEC complaint, Kovachev asserted his Fifth Amendment right against self-incrimination in refusing to answer nearly all of the SEC's questions during its investigation. (¶¶ 38, 39.)  The plaintiff also believes that Kovachev and Stevanovich knew one another.  In a December 31, 2003 email to Robert Miller, another participant in the scheme, Kovachev described Stevanovich as "my friend and senior partner."  (¶ 40.)

Although some investment firms asked detailed questions about the Solow "financial statements," and some even asked to speak with Berdon and see Berdon's audit work papers, the plaintiff believed that Westford never did.  (¶ 29.)  Furthermore, another hedge fund— Whippoorwill Associates, Inc.—contacted Berdon with questions about the fake Solow financial statements when it was considering investing in the fraud, and learned from Berdon that it had not audited the Solow financial statements.  (¶ 30.)  As a result, Whippoorwill did not purchase any notes, and informed the Government of its concerns about Marc's activities.  (¶ 30.)  Had Westford made a similar inquiry, it, too, would have learned of the fraud.  (¶ 30.)  Furthermore, Westford never inquired about the Term Loan Agreements despite the unusual nature of the

authorization (quoted *supra*), (¶ 32), and never asked why repayments on a loan to "Solow" were originating from the 5966 Account. (¶¶ 34-35.)

Westford eventually made the following seven separate investments in the Ponzi scheme:

### 1.    January 2004 Deal

On January 7, 2004, Marc sold $15 million in forged one-year Solow Notes, bearing a 10% interest rate, payable to the following entities (and in the following amounts): Westford Special Situations Fund, Ltd. ("WSSF") ($2.5 million), Bennington International Holdings, Ltd. ("Bennington") ($7.5 million) and Stafford Towne, Ltd. ("Stafford") ($5 million). (¶ 48.) WAM signed a Term Loan Agreement on behalf of these entities. (¶ 48.) Dreier LLP also paid WSSF, Bennington and Stafford each a 2% origination fee (for a total payment of $300,000) at the time they made the loan. (¶ 49.) In addition, according to Dreier LLP's books and records, Dreier LLP paid WSSF, Bennington and Stafford interest under the January 2004 Deal totaling at least $775,001.[3] (¶ 50.)

On January 7, 2005, Dreier LLP repaid the principal invested by each of WSSF, Bennington and Stafford in the January 2004 Deal. (¶ 51.)

### 2.    June 2004 Deal

On June 24, 2004, Marc sold $15 million in one-year Solow Notes, bearing a 10% interest rate, to the following entities (and in the following amounts): Westford Special Situations Master Fund L.P. ("WSSMF") ($750,000), Bennington ($10.5 million) and Stafford ($3.75 million). (¶ 52.) WAM signed a Term Loan Agreement on behalf of these entities. (¶ 52.) Dreier LLP also

---

[3]    A total of $1.5 million should have been paid in interest under the January 2004 Deal. On information and belief, Dreier LLP paid an additional $775,000 (for a total of $1.5 million) to these Westford entities such that they received the total amount owing under the January 2004 Deal. (¶ 50.)

paid WSSMF, Bennington and Stafford each a 2% origination fee (for a total fee of $300,000) at the time they made the loan.  (¶ 53.)  Westford repeatedly extended the maturities of these notes, and the interest rate on the notes was eventually increased to 18%.  (¶ 54.)

Dreier LLP paid WSSMF, Bennington and Stafford interest and fees totaling at least $5,331,666, and on December 29, 2006, returned the $15 million in principal to WSSMF, Bennington and Stafford.  (¶¶ 55-56.)

### 3.    January 2005 Deal

On January 14, 2005, Marc sold $30 million in Solow Notes, bearing a 10% interest rate, payable to the following entities (and in the following amounts): WSSMF ($2 million), Bennington ($10 million) and Stafford ($18 million).  (¶57.)  WAM or Westford Global Asset Management Ltd. ("WGAM") signed a Term Loan Agreement on behalf of these entities.  (¶57.)  Dreier LLP paid WSSMF, Bennington and Stafford each a 3.5% origination fee at the time they made the loan (for a total fee of $1.05 million), and a total of $3,066,668 in interest.  (¶¶ 57-58.)

On January 17, 2006, Dreier LLP paid WSSMF, Bennington and Stafford a total of $30 million, representing a return of principal.  (¶ 59.)

### 4.    February 2006 Deal

On February 10, 2006, Marc sold $5 million in Solow Notes, bearing an 11% interest rate, payable to the following entities (and in the following amounts): WSSMF ($250,000), Bennington ($3.5 million) and Stafford ($1.25 million).  (¶ 60.)  WAM or WGAM signed a Term Loan Agreement on behalf of these entities.  (¶ 60.)  In addition, Dreier LLP paid WSSMF, Bennington and Stafford each a 2% origination fee (for a total fee of $100,000) at the time they made the loan and a total of $591,403 in interest.  (¶¶ 60-61.)

On December 29, 2006, Dreier LLP repaid the principal totaling $5 million to WSSMF, Bennington and Stafford.  (¶ 62.)

### 5.      June 2006 Deal

On June 29, 2006, Marc sold a $10 million Solow Note bearing an interest rate of 15% in favor of WSSMF.  (¶ 63.)  Dreier LLP paid WSSMF a 3% origination fee, totaling $300,000, and on June 29, 2007, transferred $11,520,833 to WSSMF as payment of principal and interest due under the June 2006 note.  (¶¶ 64-65.)

### 6.      December 2006 Deal

On December 29, 2006, Marc sold a total of eight one-year Solow Notes, aggregating $20 million and each bearing a 10% interest rate, to the following entities (and in the following amounts): Carston Spires, Ltd ("Carston") ($2.1 million), Bennington ($6 million), Stafford ($600,000) and Adams International Trading, Ltd. ("Adams") ($11.3 million).  (¶ 66.)  In addition to the 10% interest rate, "Solow" purportedly agreed in the Term Loan Agreements to pay a 2.5% per quarter "facility fee," raising the effective annual interest rate to an exorbitant 20%, plus a 2.5% origination fee (for a total origination fee of $500,000).  (¶ 67.)

Dreier LLP paid a total of $4,022,224 in interest and facility fees, and $500,000 in origination fees.  (¶ 68.)  The Amended Complaint does not state whether or when the principal was ever repaid,[4] but the Amended Complaint implies that it was based on the amounts sought by the plaintiff.

---

[4]      Westford did not raise this omission in the Motion.

7.        **March 2007 Deal**

On March 30, 2007, Marc sold $20 million in forged one-year Solow Notes, bearing an 11% interest rate, payable to the following entities (and in the following amounts): Adams ($9 million), Bennington ($7 million) and Stafford ($4 million).  (¶ 69.)  Dreier LLP paid Adams, Bennington and Stafford each a 2.75% origination fee (for a total of $350,000) on March 30, 2007.  (¶ 70.)  Dreier LLP also paid a 2.75% facility fee for the first three quarters of the life of the notes, and a 2.5% facility fee for the last quarter, and the origination fee and the facility fees increased the effective interest rate on the notes to over 22%.  (¶ 71.)  In total, Dreier LLP paid $4,440,779 in interest and facility fees, on top of the $350,000 origination fee, and on April 1, 2008, and April 15, 2008, Dreier LLP repaid the principal to Adams, Bennington and Stafford.[5]  (¶¶ 72-73.)

In the end, Westford invested a total of $115 million[6] and received payments of principal, interest and fees totaling over $137,648,574.  (¶¶ 41, 46.)  Westford received exorbitant interest rates, origination fees and facility fees, which, in one case, added up to an effective interest rate of 22%.  (*See* ¶¶ 43, 44.)  The deals made no financial sense for Solow based on its fake financial statements.  Rather than make a reasonable inquiry, Westford "blindly invested" in the Note Fraud in the hopes of turning a huge profit at the expense of later investors.  (¶ 45.)  Westford would have discovered that the Solow financial statements were fabrications with a reasonable amount of due diligence, and that Solow was unaware of the note program that Marc was peddling.  Westford's failure to make inquiry allowed Marc to perpetuate the Note Fraud.  (¶ 47.)

---

[5]        Prior to this principal repayment, Westford may have reassigned some of the right to interest, facility fees and principal repayment under the March 2007 Deal notes and Term Loan Agreement to Carston and/or WSSMF because some of the Dreier LLP transfers made in connection with the maturity of the notes were made to accounts elsewhere associated with Carston and WSSMF.  (¶ 73.)

[6]        The chronology suggests that some of the repayments were immediately rolled over into new investments. Westford never actually had $115 million invested at one time.

C.    **This Adversary Proceeding**

Dreier LLP transferred $137,648,574 to Westford within six years of the petition date (the "State Transfers") of which $80,294,253 was transferred within two years of the petition date (the "Federal Transfers").  The Amended Complaint divides the transfers into these two groups and asserts the following eight claims for relief:

| Count | Claim | Amount Sought | Basis of Claim |
|-------|-------|---------------|----------------|
| I | Actual Fraudulent Conveyances  (¶¶ 75-81) | $137,648,574 plus attorneys' fees | 11 U.S.C. §§ 544 and 550 and N.Y. DEBT. & CRED. LAW §§ 276, 276-a, 278 and 279 |
| II | Constructive Fraudulent Conveyances (¶¶ 82-88) | $137,648,574 | 11 U.S.C. §§ 544 and 550 and N.Y. DEBT. & CRED. LAW §§ 273, 278 and 279 |
| III | Constructive Fraudulent Conveyances (¶¶ 89-95) | $137,648,574 | 11 U.S.C. §§ 544 and 550 and N.Y. DEBT. & CRED. LAW §§ 274, 278 and 279 |
| IV | Constructive Fraudulent Conveyances (¶¶ 96-102) | $137,648,574 | 11 U.S.C. §§ 544 and 550 and N.Y. DEBT. & CRED. LAW §§ 275, 278 and 279 |
| V | Actual Fraudulent Transfers (¶¶ 103-08) | $80,294,253 | 11 U.S.C. §§ 548(a)(1)(A) and 550 |
| VI | Constructive Fraudulent Transfers (¶¶ 109-17) | $80,294,253 | 11 U.S.C. §§ 548(a)(1)(B) and 550 |
| VII | Equitable Subordination (¶¶ 118-20) | | 11 U.S.C. § 510(c) |
| VIII | Liability of WGAM as General Partner of WSSMF | Relief sought against WSSMF | Partnership law |

In addition to the specific relief set forth above, the plaintiff seeks prejudgment interest and the imposition of a constructive trust on the proceeds of the transfers for the benefit of the Dreier LLP Estate.

Westford has moved to dismiss the Amended Complaint.  (*See Westford Defendants' Motion to Dismiss the Trustee's Amended Complaint*, dated July 18, 2011 ("*Westford Memo*") (ECF Doc. # 23).)  In the main, the Motion argues that the Court can determine as a matter of law

10

from the face of the Amended Complaint that Westford gave value for the transfers and received

them in good faith.  Westford also argues that the Court should dismiss the equitable subordination

claim because none of the defendants have filed a claim against the Dreier LLP estate.  Finally, the

claim for attorneys' fees under section 276-a of the New York Debtor and Creditor Law ("DCL")

should be dismissed because the plaintiff has failed to allege that the transferees acted with intent

to defraud.[7]

### DISCUSSION

**A.      Standards Governing the Motion to Dismiss**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 129 S. Ct.

1937, 1949 (2009) (citations omitted); *accord Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570

(2007).  *Iqbal* outlined a two-step approach in deciding a motion to dismiss.  *Fowler v. U.P.M.C.*

*Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009) ("The Supreme Court's opinion in *Iqbal* extends the

reach of *Twombly* [to civil cases] . . . [and offers] a two-part analysis.").  First, the court should

begin by "identifying pleadings that, because they are no more than [legal] conclusions, are not

entitled to the assumption of truth."  *Iqbal*, 129 S. Ct. at 1950.  Threadbare recitals of the elements

of a cause of action supported by conclusory statements are not factual.  *See id.* at 1949.  Second,

the court should give all "well-pleaded factual allegations" an assumption of veracity and

determine whether, together, they plausibly give rise to an entitlement of relief.  *Id.* at 1950.

Plausibility requires more than a "sheer possibility" of wrongdoing—the plaintiff must plead

---

[7]      The Amended Complaint fails to allege that each of the defendants received a transfer; it alleges that only
some did.  Westford mentioned this in a footnote in its reply brief, (*see Reply Memorandum of Law in Further Support
of Westford Defendants' Motion to Dismiss the Trustee's Amended Complaint*, dated Aug. 31, 2011 ("*Westford
Reply*"), at 3 n.3 (ECF Doc. # 27)), but did not move to dismiss as to those defendants on this independent ground.
Hence, the Court does not consider it.

sufficient factual content to allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 1949. Determining whether a claim is plausible is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 1950.

In deciding the motion, "courts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice," *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 322 (2007), in addition to statements in "legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007); *accord Roth v. Jennings*, 489 F.3d 499, 509 (2d Cir. 2007); *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *Rothman v. Gregor*, 220 F.3d 81, 88-89 (2d Cir. 2000).

## B.    Actual Fraudulent Transfers

Count I seeks to recover the State Transfers as actual fraudulent conveyances under DCL § 276,[8] and Count V asserts a similar claim to recover the Federal Transfers as actual fraudulent transfers under 11 U.S.C. § 548(a)(1)(A).[9] Westford did not challenge the sufficiency of the actual

---

[8]    DCL § 276 states:

> Every conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors.

Section 544(b)(1) allows the trustee to assert the rights of a qualifying creditor under DCL § 276 as well as the other state law avoidance provisions discussed in the succeeding text to avoid the transfers to Westford.

[9]    Section 548(a)(1)(A) allows a trustee to avoid a transfer made or an obligation incurred by the debtor where the debtor "made such transfer or incurred such obligation with actual intent to hinder, delay, or defraud any entity to which the debtor was or became, on or after the date that such transfer was made or such obligation was incurred, indebted."

12

fraudulent transfer allegations in its original moving papers.[10]  Instead, it contended that the

allegations in the Amended Complaint established its affirmative defenses under the Bankruptcy

Code and New York law that it paid value for the transfers and received them in good faith.

(*Westford Memo* at 10-14.)  I disagree.

The Bankruptcy Code and New York law offer safe harbors to fraudulent transferees to the

extent they pay value and receive the transfer in good faith.[11]  The safe harbor is an affirmative

defense that the transferee must plead and prove, and is not an element of the plaintiff's claim.

*Gowan v. Patriot Group, LLC (In re Dreier LLP)*, 452 B.R. 391, 426 (Bankr. S.D.N.Y. 2011)

("*Patriot*").  Nevertheless, a Court may grant a motion to dismiss under Rule 12(b)(6) where an

affirmative defense appears on the face of the complaint.  *See McKenna v. Wright*, 386 F.3d 432,

436 (2d Cir. 2004); *Pani v. Empire Blue Cross Blue Shield*, 152 F.3d 67, 74 (2d Cir. 1998).

---

[10]    In its reply, Westford argued that the actual fraudulent transfer claims should be dismissed because lack of "fair consideration" is "an essential element of any fraudulent transfer claim." (*Westford Reply* at 17.)  Westford did not make this argument in its opening papers, and it should not be considered.  In any event, it is wrong.  Where the plaintiff alleges that the debtor made a transfer with actual intent to hinder, delay or defraud his creditors, the plaintiff is not required to plead or prove that the consideration was inadequate.  *E.g.*, *Sharp Int'l Corp. v. State St. Bank (In re Sharp Int'l Corp.)*, 403 F.3d 43, 56 (2d Cir. 2005) (discussing New York law); *United States v. McCombs*, 30 F.3d 310, 328 (2d Cir. 1994) (same); *Nisselson v. Empyrean Inv. Fund, L.P. (In re MarketXT Holdings Corp.)*, 376 B.R. 390, 402 (Bankr. S.D.N.Y. 2007) (discussing New York and federal bankruptcy law); *Bayou Superfund, LLC v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*, 362 B.R. 624, 629 (Bankr. S.D.N.Y. 2007) (discussing federal bankruptcy law).  Rather, the defendant bears the burden of proving value and good faith as an affirmative defense.

[11]    Section 548(c) of the Bankruptcy Code states:

Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such a transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

DCL § 278(1) provides a similar defense to "a purchaser for fair consideration without knowledge of the fraud at the time of the purchase, or one who has derived title immediately or mediately from such a purchaser."  DCL § 278(2) states that "[a] purchaser who without actual fraudulent intent has given less than a fair consideration for the conveyance or obligation, may retain the property or obligation as security for repayment."

The plaintiff acknowledges that Dreier LLP was obligated to make restitution to Westford, and that its repayment of the principal amount of Westford's investment—$115 million— constituted equivalent value for the purposes of the fraudulent transfer and fraudulent conveyance laws. (*Memorandum in Opposition to Westford's Motion to Dismiss the Trustee's Amended Complaint*, dated Aug. 17, 2011 ("*Trustee's Opposition*"), at 8 (ECF Doc. # 25).) The parties disagree over whether Westford paid value for the interest, origination fees and other charges (collectively, the "Excess Payments") over and above the principal.

The general rule in Ponzi scheme cases is that net winners must disgorge their winnings. "[I]nvestors may retain distributions from an entity engaged in a Ponzi scheme to the extent of their investments, while distributions exceeding their investments constitute fraudulent conveyances which may be recovered by the Trustee." *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 682 (Bankr. S.D.N.Y. 2000), *aff'd*, 264 B.R. 303 (S.D.N.Y. 2001); *accord Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund, LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 337 (S.D.N.Y. 2010) ("[V]irtually every court to address the question has held unflinchingly that to the extent that investors have received payments in excess of the amounts they have invested, those payments are voidable as fraudulent transfers.") (internal quotation marks and citations omitted); *Picard v. Cohmad Secs. Corp. (In re Bernard L. Madoff Inv. Secs. LLC)*, 454 B.R. 317, 333 (Bankr. S.D.N.Y. 2011) ("[W]hen investors invest in a Ponzi scheme, any payments that they receive in excess of their principal investments can be avoided by the Trustee as fraudulent transfers."); *Patriot*, 452 B.R. at 440 n.44 ("The Court's conclusion that the Defendants did not provide 'reasonably equivalent value' for the payments in excess of principal is consistent with those courts that have held that investors in a Ponzi scheme are not entitled to retain the fictitious profits they received."). The rationale is that the Ponzi scheme

14

participant does not provide any value to the debtor in exchange for the fictitious profits it receives. *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir.) ("The paying out of profits to [the Ponzi scheme investor] not offset by further investments by him conferred no benefit on the [entities involved in the Ponzi scheme] but merely depleted their resources faster.") (Posner, J.), *cert. denied*, 516 U.S. 1028 (1995); *Armstrong v. Collins*, No. 01 Civ. 2437 (PAC), 2010 WL 1141158, at *22 (S.D.N.Y. Mar. 24, 2010) ("By 'investing' in a Ponzi scheme run by the debtor, even unwittingly, a person does not—strictly speaking—provide 'value.'  This is because the money invested simply perpetuates the debtor's fraudulent scheme: 'the longer a Ponzi scheme is kept going the greater the losses to the investors.'" (quoting *Scholes*, 56 F.3d at 757)).

Westford nonetheless contends that the general rule does not apply in this case, and it is entitled to keep the Excess Payments as well as the principal under two connected theories.  Ignoring *Scholes* and similar decisions, it insists that the lender to a fraudulent business provides "value" in exchange for the interest it receives.  (*Westford Memo* at 7.)  Furthermore, under the doctrine of implied warranty of authority, Dreier LLP became liable on the Solow Notes, and the payment of interest satisfied Dreier LLP's contractual obligation on those notes.  Westford relies primarily on two cases for support:  *Lustig v. Weisz & Assocs., Inc. (In re Unified Commercial Capital Inc.)*, 260 B.R. 353 (Bankr. W.D.N.Y. 2001) and *Daly v. Deptula (In re Carrozzella & Richardson),* 286 B.R. 480 (D. Conn. 2002).

As just discussed, *Scholes* decisively rejected the notion that a Ponzi scheme investor provides value beyond its principal investment.  Furthermore, Judge Martin Glenn considered and rejected the identical arguments in *Patriot*, distinguishing the same authorities upon which Westford relies.  In both *Unified Commercial Capital* and *Carrozzella*, the defendants invested in Ponzi schemes run by the debtors, and their investment contracts required the payment of interest.

15

Focusing on the underlying transaction between the parties rather than the debtors' fraudulent

business practices, both courts rebuffed the trustees' efforts to recover the interest payments under

a fraudulent transfer theory, ruling that the payment of interest satisfied a contractual obligation.

*Unified Commercial Capital*, 260 B.R. at 351 ("I simply do not agree that it is against sound public

policy to allow an innocent investor victim to enforce a contract with an entity engaged in a 'Ponzi'

scheme to pay a reasonable rate of interest for the use (loan) of funds."); *Carrozzella*, 286 B.R. at

491 ("There is nothing in the statute to support a finding that the Debtor did not receive 'reasonably

equivalent value' by virtue of the satisfaction of the debt owing to the investors, in return for its

payment of contractual interest to Defendants, simply because the Debtor was engaged in a Ponzi

scheme."). Judge Glenn distinguished *Unified Commercial Capital* and *Carrozzella* on the ground

that Dreier LLP's payment of interest did not satisfy any contractual obligation as Dreier LLP was

not a party to the Solow Notes. *Patriot*, 452 B.R. at 438; *see Bayou*, 439 B.R. at 337 (*Unified

Commercial Capital* and *Carrozzella* involved the payment of commercially reasonable,

contractually guaranteed rates of return).

Attempting to avoid the same result, Westford, like the defendants in *Patriot*, contends that

Dreier LLP was contractually obligated on the Solow Notes under the doctrine of implied warranty

of authority. The latter holds that an agent who purports to enter into a contract on behalf of his

principal without authority to do so becomes personally liable to the aggrieved party for damages,

including the loss of the benefit expected from performance. *See DePetris & Bachrach, LLP v.

Srour,* 898 N.Y.S.2d 4, 5-6 (N.Y. App. Div. 2010). Under this theory, the payment of interest is an

expected benefit. This doctrine might explain Marc's liability for interest; he misrepresented his

authority to sell the Solow Notes, and became contractually liable on them. Westford then makes

an enormous leap: Marc, the sole equity partner of Dreier LLP, acted as Dreier LLP's agent in

16

running the Ponzi scheme, and accordingly, Dreier LLP is vicariously liable for breach of the implied warranty of authority. (*Westford Memo* at 8-9 & 9 n.3.)

In rejecting this same argument in *Patriot*, Judge Glenn concluded that Marc's wrongful conduct could not be imputed automatically to Dreier LLP, *Patriot*, 452 B.R. at 439, and the same conclusion applies here. The Amended Complaint does not allege that Marc was acting as an agent for Dreier LLP, or that Dreier LLP and Marc were alter egos. Although Dreier LLP had certain connections to the Ponzi scheme beyond Marc's status as its sole equity partner—Solow was promoted as a long-standing client of the firm (¶ 27), communications were sent to Marc's attention at Dreier LLP (¶ 33) and Marc used a Dreier LLP bank account to receive and disburse Ponzi scheme payments (¶¶ 34-35)—the Court cannot conclude as a matter of law that Dreier LLP is liable vicariously or otherwise for Marc's breach of the implied warranty of authority.

Finally, Westford's reliance on this Court's decision in *Gowan v. Wachovia Bank, N.A. (In re Dreier LLP)*, 453 B.R. 499 (Bankr. S.D.N.Y. 2011) ("*Wachovia*") is misplaced. There, the defendant bank provided letters of credit and a line of credit to Dreier LLP. The defendant was not an investor in the Ponzi scheme. During the course of the banking relationship, Dreier LLP made payments and gave liens to the defendant. The Dreier LLP trustee sued the defendant alleging claims sounding in actual and constructive fraudulent transfer. In concluding that the complaint alleged legally sufficient claims of intentional fraudulent transfer, the Court ruled that Marc's knowledge of the fraudulent nature of the transfers and his intent to defraud his creditors would be imputed to Dreier LLP. *Id.* at 510.

The same rules regarding the imputation of Marc's *knowledge and intent* apply in this case. Marc orchestrated the transfers from Dreier LLP to Westford. It does not follow, however, that all of Marc's *actions* were also imputed to Dreier LLP, and that Dreier LLP was, therefore,

contractually responsible to make the Excess Payments.[12]  Furthermore, the Court cannot conclude

as a matter of law, after drawing all reasonable inferences in the plaintiff's favor, that the face of

the Amended Complaint establishes Westford's "good faith" defense.  To the contrary, as

discussed in more detail below, the Amended Complaint adequately pleads that Westford lacked

good faith, albeit under New York law.  Accordingly, the motion to dismiss Counts I and V is

denied.

## C.    Constructive Fraudulent Transfers

### 1.      Bankruptcy Law

Count VI asserts a claim to recover the Federal Transfers as constructively fraudulent under

11 U.S.C. § 548(a)(1)(B).  Section 548(a)(1)(B) provides, in relevant part, that the trustee can avoid

an obligation or transfer where the debtor:

> (i) received less than a reasonably equivalent value in exchange for such transfer or
> obligation; and

> (ii) (I) was insolvent on the date that such transfer was made or such obligation was
> incurred, or became insolvent as a result of such transfer or obligation; (II) was
> engaged in business or a transaction, or was about to engage in business or a
> transaction, for which any property remaining with the debtor was an unreasonably
> small capital; [or] (III) intended to incur, or believed that the debtor would incur,
> debts that would be beyond the debtor's ability to pay as such debts matured.

---

[12]      Westford also argues, citing *United States v. Rodiek*, 120 F.2d 760, 761 (2d Cir. 1941), that as a victim of
fraud, it is entitled under New York law to restitution plus interest from the time that Marc perpetrated his fraud.
*Rodiek* dealt with the date on which interest began to run for the purpose of computing interest on a judgment.  While
*Rodiek* concerned a claim under federal law, N.Y. C.P.L.R. 5001 addresses the same subject under New York law.
With exceptions that are not relevant "[i]nterest shall be recovered upon a sum awarded," N.Y. C.P.L.R. 5001(a), and
"shall be computed from the earliest ascertainable date the cause of action existed."  N.Y. C.P.L.R. 5001(b).  Had
Westford sued Marc (or Dreier LLP) and recovered a judgment, it might well have been entitled to an award of
interest.  It was not, however, injured by Marc's fraud—it earned a handsome profit—and never sued or recovered a
judgment.  Hence, it was never became entitled to the interest provided for under the N.Y. C.P.L.R.

Westford contends that the transfers satisfied an antecedent debt, (*Westford Memo* at 5-6), and correctly points out that the satisfaction of an antecedent debt constitutes value. *See* 11 U.S.C. § 548(d)(2)(A). Consequently, the plaintiff cannot demonstrate that Dreier LLP did not receive "reasonably equivalent value." The plaintiff concedes that Westford gave "reasonably equivalent value" to the extent Dreier LLP repaid its principal investment but not for anything more. (*Trustee's Opposition* at 8.)

For the reasons stated, the Amended Complaint adequately alleges that Westford did not give reasonably equivalent value in exchange for the Excess Payments. Furthermore, the face of the Amended Complaint does not establish Westford's affirmative defense under 11 U.S.C. § 548(c) with respect to the Excess Payments. Accordingly, the motion to dismiss Count VI is denied to the extent that the plaintiff seeks to avoid and recover the Excess Payments but is otherwise granted.

### 2.    New York Law

Counts II, III and IV seek to recover the State Transfers through 11 U.S.C. § 544(b) and, respectively, sections 273, 274 and 275 of New York's Debtor & Creditor Law.[13] Each claim requires the plaintiff to allege a lack of "fair consideration." Under DCL § 272

---

[13]    DCL § 273 provides:

Every conveyance made and every obligation incurred by a person who is or will be thereby rendered insolvent is fraudulent as to creditors without regard to his actual intent if the conveyance is made or the obligation is incurred without a fair consideration.

DCL § 274 provides:

Every conveyance made without fair consideration when the person making it is engaged or is about to engage in a business or transaction for which the property remaining in his hands after the conveyance is an unreasonably small capital, is fraudulent as to creditors and as to other persons who become creditors during the continuance of such business or transaction without regard to his actual intent.

Fair consideration is given for property, or obligation,

a. When in exchange for such property, or obligation, as a fair equivalent therefor, and in good faith, property is conveyed or an antecedent debt is satisfied, or

b. When such property, or obligation is received in good faith to secure a present advance or antecedent debt in amount not disproportionately small as compared with the value of the property, or obligation obtained.

Thus, "fair consideration" consists of two elements—a "fair equivalent" exchange and good faith. The good faith is that of the transferee. *HBE Leasing v. Frank*, 61 F.3d 1054, 1058-59 & 1059 n.5 (2d Cir. 1995) ("*HBE Leasing II*"); *see Sharp Int'l*, 403 F.3d at 54 n.4. The plaintiff need plead only one of the elements to defeat a motion to dismiss a constructive fraudulent conveyance claim under New York law. *Picard v. Madoff (In re Bernard L. Madoff Inv. Secs. LLC)*, 458 B.R. 87, 110 (Bankr. S.D.N.Y. 2011); *Patriot*, 452 B.R. at 443. The plaintiff concedes that Westford paid a fair equivalent to the extent that it received the repayment of its principal investment. She contends, however, that the entire State Transfer was constructively fraudulent because Westford lacked good faith.

Good faith is an "elusive concept" that is hard to locate in a constructive fraud statute that does not require proof of intent. *Sharp Int'l*, 403 F.3d at 54; *McCombs*, 30 F.3d at 326 n.1. Nevertheless, it is a separate element of fair consideration, and reflects the overarching principle that the law protects a *bona fide* purchaser for value, even one who takes his interest from a fraudulent transferor. *See* Note, *Good Faith and Fraudulent Conveyances*, 97 HARV. L. REV. 495, 498 n.16 (1983). Good faith focuses on the transferee's knowledge of the transferor's fraudulent intent, and is lacking where the transferee "knew, or should have known, that he was not trading

---

DCL § 275 provides:

Every conveyance made and every obligation incurred without fair consideration when the person making the conveyance or entering into the obligation intends or believes that he will incur debts beyond his ability to pay as they mature, is fraudulent as to both present and future creditors.

normally, but that on the contrary, the purpose of the trade, so far as the debtor was concerned, was

the defrauding of his creditors."  1 GARRARD GLENN, FRAUDULENT CONVEYANCES AND

PREFERENCES § 295, at 512 (Rev. ed. 1940) ("GLENN"); *accord HBE Leasing v. Frank*, 48 F.3d

623, 636 (2d Cir. 1995) ("*HBE Leasing I*").

It is well-settled that the repayment of an antecedent debt constitutes fair consideration,

satisfying both prongs of DCL § 272, unless the transferee is an officer, director or major

shareholder of the transferor.  *Atlanta Shipping Corp., Inc. v. Chem. Bank*, 818 F.2d 240, 249 (2d

Cir. 1987); *accord Sharp Int'l*, 403 F.3d at 54; *HBE Leasing I*, 48 F.3d at 634.  As noted, the

plaintiff concedes that Westford paid the fair equivalent for the return of its principal.  In addition,

Westford was neither an officer nor a director nor a major shareholder of Dreier LLP.

Accordingly, it would appear that the repayment of Westford's principal investment could not be a

constructive fraudulent conveyance.

This assumes, however, that the antecedent debt was a valid obligation that was incurred in

good faith.  The repayment of an antecedent debt is not fair consideration when the transferee knew

*at the time* it extended the original credit that the funds might not be used for legitimate purposes,

and that the debtor might improperly funnel the proceeds to third parties.[14]  *Sharp Int'l*, 403 F.3d at

55 (discussing and distinguishing *HBE Leasing I*, 48 F.3d at 636); *Picard v. Merkin (In re Bernard

L. Madoff Inv. Secs. LLC)*, No. 11 MC 0012 (KMW), 2011 WL 3897970, at *11 (S.D.N.Y. Aug.

31, 2011) (The "allegations of knowledge of the fraud at the time of investment remove the instant

matter from the purview of the rule articulated in *Sharp*.").  Knowledge of the fraudulent scheme

---

[14]     This is akin to the collapsing doctrine under which a trustee can recover a fraudulent transfer from a transferee who knew at the time it extended credit to the debtor that the debtor would retransfer the proceeds fraudulently.  *See HBE Leasing I*, 48 F.3d at 635.  This is essentially what the plaintiff alleges; Westford knew at the time that it made each investment that Dreier LLP would fraudulently transfer the proceeds to a third party in connection with Marc's Ponzi scheme.

may be actual or constructive.  *See HBE Leasing I*, 48 F.3d at 636 ("We believe that where, as here, a transferee has given equivalent value in exchange for the debtor's property, the statutory requirement of 'good faith' is satisfied if the transferee acted without either actual or constructive knowledge of any fraudulent scheme.").  The plaintiff contends that Westford had constructive knowledge that Marc was running a Ponzi scheme.

The standard for assessing constructive knowledge under DCL § 272 is uncertain.  Some cases state that one who does not make appropriate inquiries is charged with the knowledge that ordinary diligence would have elicited, while others require a more active avoidance of the truth.  *Id*.  In *HBE Leasing I*, the Court appeared to adopt the latter standard to invalidate certain intra-family transfers.  There, the plaintiff recovered a RICO money judgment against H.H. Frank Enterprises, Inc. ("Enterprises").  While the RICO action was pending, Clemence Frank ("Clemence") advanced two loans in the sum of $250,000 and $100,000 to Enterprises, and Enterprises delivered two mortgages to Clemence to secure the loans.  Clemence was the wife of Hiram H. Frank and the mother of Hiram J. Frank, the majority owner of Enterprises.  She was also a former director of Enterprises.  Shortly after Enterprises received the $250,000 loan, it disbursed the funds to Clemence's son allegedly in repayment of earlier loans he made to Enterprises.  At the end of the day, Enterprises encumbered its property with two mortgages to secure a $350,000 debt, but it did not retain the corresponding benefit of the loan proceeds.

Collapsing the two transactions, the Court concluded that Clemence had constructive knowledge of the fraudulent scheme to retransfer the Enterprise loan proceeds to her son, an Enterprises insider.  As a former director of Enterprises, her fiduciary duties charged her with constructive knowledge that her son used Enterprises as a conduit to make various family and other noncorporate payments.  She also knew that her son had allegedly loaned money to Enterprises,

and might use the proceeds to make a preferential payment to himself. As a consequence, she had specific knowledge that should have alerted her to the possibility that the proceeds of her loan might be fraudulently transferred, and she should have made reasonable, diligent inquiries into the use of the proceeds. Her failure to make those inquiries represented a "conscious turning away from the subject," and accordingly, she was charged with constructive knowledge of the fraudulent scheme. *HBE Leasing I*, 48 F.3d at 637; *accord* GLENN § 304, at 532.

"Conscious turning away" involves more than mere negligence. GLENN § 304, at 532. It asks the question "did the grantee make a choice between not knowing and finding out the truth; or were the circumstances such that he was not faced with that choice?" *Id.* The standard is analogous to the "willful blindness" or "conscious avoidance" test applied in criminal and civil litigation where knowledge of the existence of a disputed fact is established by evidence that a person is aware of the high probability of its existence but shuts his eyes. *See United States v. Nektalov,* 461 F.3d 309, 315 (2d Cir. 2006) ("The culpability of the wilfully blind defendant lies in his averting his eyes to what he thinks he sees, not in the objective accuracy of his vision. In other words, the applicability of the doctrine does not turn on the truth of the particular proposition in question, but on what the defendant does to avoid reaching subjective certainty (mistaken or not) about that proposition. Thus, conscious avoidance encompasses a defendant's deliberately refusing to confirm the existence of one or more facts that he believes to be true.") (citations and internal quotation marks omitted); *Woodman v. WWOR–TV, Inc.,* 411 F.3d 69, 84 n.14 (2d Cir. 2005) ("[A] party's knowledge of a disputed fact may also be proved through evidence that he consciously avoided knowledge of what would otherwise have been obvious to him. As we have explained in the criminal context, [t]he rationale for the conscious avoidance doctrine is that a defendant's affirmative efforts to 'see no evil' and 'hear no evil' no not somehow magically invest him with the

23

ability to 'do no evil.'. . . [The law] does not tolerate a person shutting his eyes to a fact . . . *after* realizing its high probability in order to deny that he acted with the requisite knowledge and intent to discriminate.") (citations and internal quotation marks omitted); *Patriot*, 452 B.R. at 449-50.[15]

This standard of good faith is more subjective than the corresponding good faith defense under 11 U.S.C. § 548(c).  *See Picard v. Katz*, No. 11 Civ. 3605 (JSR), 2011 WL 4448638, at *5 (S.D.N.Y. Sept. 27, 2011) ("The difference between the inquiry notice approach and the willful blindness approach is essentially the difference between an objective standard and a subjective standard.").  Under Bankruptcy Code § 548(c), a transferee lacks good faith if (1) it has information placing it on inquiry notice that the transferor was insolvent, or that the transfer might be made with a fraudulent purpose, and (2) a diligent inquiry would have discovered the fraudulent purpose of the transfer.  *Bayou,* 439 B.R. at 310-12 (collecting cases); *Bear, Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund, Ltd.)*, 397 B.R. 1, 22-23 (S.D.N.Y. 2007); *Wachovia*, 453 B.R. at 513; *Patriot*, 452 B.R. at 447.  Under this standard, the duty to inquire is triggered by the acquisition of information that would have caused a reasonable person in the defendant's position to investigate the matter further.  *Manhattan Inv. Fund, Ltd.*, 397 B.R. at 23.  The information that diligent inquiry would have disclosed cannot be the information that triggers the duty to inquire in the first place.  If the transferee lacked inquiry notice, the fact that diligent inquiry would have uncovered the transferor's fraud or insolvency is irrelevant.

Based on the foregoing, the Court concludes that the appropriate test for determining constructive knowledge, and hence "good faith," under DCL § 272 is the subjective "conscious

---

[15]    "Conscious turning away" is also analogous to the reckless disregard of the truth under the federal securities laws where *scienter* is established by "an *egregious* refusal to see the *obvious*, or to *investigate the doubtful*."  *South Cherry St. LLC v. Hennessee Group LLC*, 573 F.3d 98, 109 (2d Cir. 2009) (emphasis in original) (quoting *Chill v. Gen. Elec. Co.,* 101 F.3d 263, 269 (2d Cir. 1996)).

turning away" standard under which the defendant, as opposed to the hypothetical reasonable person, is charged with the knowledge of what was obvious but ignored, or doubtful but not explored.[16]  This does not wholly eliminate the relevance of objective evidence of knowledge. What a reasonable person knew or should have known may show circumstantially what the defendant knew or should have known.

The plaintiff argues that the allegations in the Amended Complaint are sufficient to show that Westford consciously turned away from information indicating that when it purchased the Solow Notes it was investing in a Ponzi scheme.  (*Trustee's Opposition* at 16.)  She identifies several "red flags" that come down to the following:  (1) Kovachev was under indictment at the time for operating a Ponzi scheme,[17] and Stevanovich, his "friend and senior partner" (and hence, Westford) likely knew that the Solow Notes were being sold by a Ponzi schemer, (2) the investments were too good to be true given the substantial effective interest rates, (3) the fake Solow financial statements indicated that Solow had hundreds of millions of dollars in net income, making it implausible that Solow would borrow money, paying above-market interest rates coupled and additional fees, and (4) the documents in the information package and the transaction itself contained so many irregularities and unusual provisions that Westford should have thought that something was awry.  (*See Trustee's Opposition* at 16-17, 3-5.)  Despite these red flags "Westford blindly invested in the Note Fraud in the hopes of turning a huge profit at the expense of later investors."  (¶ 45.)

Some of the plaintiff's red flags are less conspicuous than the plaintiff supposes, and are

---

[16]    Part of the confusion may be that courts, including this one, have conflated the standards for good faith under DCL § 272 (and DCL § 278) with good faith under 11 U.S.C. § 548(c).

[17]    The Amended Complaint alleges that Kovachev was charged in an SEC complaint.  It does not allege that he had been indicted.

consistent with a legitimate transaction. For example, Solow was a client of Dreier LLP and there was nothing remarkable in the fact that Westford was asked to make payments to and received payments from the 5966 Account, a Dreier LLP escrow account. *Cf. Fortress Credit Corp. v. Dechert LLP*, 2011 Slip. Op. 08626, 2011 WL 5922969, at *2 (N.Y. App. Div. Nov. 29, 2011) (investors had no reason to suspect that the Solow Notes were forged since Marc was Solow's attorney and a guarantor of the loan). Moreover, Westford made its investments and received its repayments in accordance with the deal documents. There are no allegations regarding unusual payment or collection practices.[18] Lastly, Stevanovich's supposed friendship with Kovachev and the latter's legal problems with the SEC was not a red flag. The Amended Complaint does not allege that Stevanovich ever described Kovachev as a friend or that he knew that the SEC had charged Kovachev with running a Ponzi scheme.[19] In fact, Kovachev brought the proposed investment to Zombek and not his "friend" Stevanovich.

The red flags regarding the excessive interest rates and other borrowing costs coupled with the allegations that Solow had substantial cash are more compelling. The Amended Complaint implies that the deal was too good to be true because Solow overpaid to borrow cash it did not need in the first place for unspecified real estate investments. This essentially amounts to an allegation that the consideration Westford paid was grossly inadequate, and a presumption of fraud arises when the consideration is grossly inadequate or disparate. GLENN § 296, at 512; *cf. Lowenstein v. Reikes*, 60 F.2d 933, 936 (2d Cir. 1932) ("A sale for a grossly inadequate consideration is recognized as one of the common badges of fraud, casting doubt upon the good faith of the

---

[18]    Westford did grant extensions in connection with the June 2004 deal. Repayment extensions are common enough and do not trigger a suspicion that the obligee is holding bogus notes forged by a Ponzi schemer.

[19]    The plaintiff also states that Stevanovich has been accused of participating in a Ponzi scheme, citing a 2010 complaint filed by the trustee in another bankruptcy. (*Trustee's Opposition* at 17 n.7.) The purpose of the reference is unclear. The Amended Complaint does not state or imply that Westford knew that Stevanovich ran a Ponzi scheme; it alleges that Westford knew or should have known that Marc did.

26

purchaser."), *cert denied*, 287 U.S. 669 (1933).  Recognizing the difficulty in drawing the line between a good deal and an unfair one, I cannot conclude as a matter of law that Westford gave fair consideration in exchange for what it received.

In addition, the deal documents contained some unusual provisions, such as the exclusion of Solow from communications and the blanket authorization to act on Solow's behalf.  The Amended Complaint implies that these provisions were so unusual that Westford should not have ignored them and should have inquired about them.  Finally, the Amended Complaint alleges that other hedge fund managers and prospective investors made inquiries to Berdon, the supposed accountants, and one of them learned that the financial statements were forgeries.  As suggested earlier, this may be circumstantial evidence of the type of investigation a fund manager performs in connection with its pre-existing duty to its own investors, and hence, what Westford should have done.  The fruit of such an investigation might have informed Westford's knowledge of the *bona fides* of the proposed investment.

Westford counters that the plaintiff's theory is implausible.  Why, Westford asks rhetorically, would the defendants risk losing hundreds of millions of dollars of their clients' money if they thought they were investing in a Ponzi scheme?  *See Picard v. Katz*, 2011 WL 4448638, at *4 ("[W]hy would defendants willfully blind themselves to the fact that they had invested in a fraudulent enterprise?).  If Westford knew it was investing in a Ponzi scheme, it also knew that Solow, its cash rich ostensible obligor, would not repay the Notes.  Instead, Westford would be relying on Marc's "credit" to repay the investment, *i.e.*, on his ability to attract new victims.  Although some Ponzi schemes run for many years, they inevitably fail because each transaction drives the scheme operator deeper into insolvency, and eventually, the perpetrator will

27

not be able to attract enough new investments to pay off the old ones.  *See Churchill Mortg. Inv. Corp.*, 256 B.R. at 675-76, 681.

Nevertheless, the answer may be, as the Amended Complaint alleges, that "Westford blindly invested in the Note Fraud in the hopes of turning a huge profit at the expense of later investors."  (¶ 45.)  Based on similar "less than overwhelming" allegations, District Judge Rakoff concluded in connection with a litigation involving the Madoff Ponzi scheme that the allegations were sufficient to survive a motion to dismiss so far as the claim of willful blindness was concerned.  *Picard v. Katz*, 2011 WL 4448638, at *4.  I reach the same conclusion here, and accordingly, the motion to dismiss the state constructive fraudulent transfer claims, Counts II, III and IV, is denied.

### D.    Remaining Claims

#### 1.    Equitable Subordination

Westford has moved to dismiss the plaintiff's claim for equitable subordination (Count VII) primarily on the ground that none of the defendants filed proofs of claim.  (*Westford Memo* at 14.) The plaintiff does not oppose the relief, provided that she reserves the right to assert an equitable subordination claim in the event that any of the defendants files a proof of claim.  (*Trustee's Opposition* at 25.)  Westford has not objected to this condition in its reply, (*see Westford Reply* at 22), and accordingly, Count VII is dismissed without prejudice.

#### 2.    Attorneys' Fees

Westford seeks to dismiss the plaintiff's request for attorneys' fees which are part of her damage claim under Count I.  DCL § 276-a states in relevant part:

> In an action . . . brought by a creditor [or] trustee in bankruptcy . . . to set aside a conveyance by a debtor, where such conveyance is found to have been made by the debtor *and received by the transferee* with actual intent, as distinguished from intent

28

> presumed in law, to hinder, delay or defraud either present or future creditors, in
> which action . . . the creditor [or] trustee in bankruptcy . . . shall recover judgment,
> the justice or surrogate presiding at the trial shall fix the reasonable attorney's fees
> of the creditor [or] trustee in bankruptcy . . . in such action or special proceeding,
> and the creditor [or] trustee in bankruptcy . . . shall have judgment therefor against .
> . . the transferee . . . .

Emphasis added.

By its terms, DCL § 276-a is derivative of an actual fraudulent transfer claim under DCL § 276.  Hence, it "stands or falls" with the disposition of that claim. *Atlantic Shipping Corp. v. Chem. Bank*, 818 F.2d 240, 245 n.1 (2d Cir. 1987); *see Starmark, Inc. v. Zaccaria*, No. 91 Civ. 2764 (JFK), 1992 WL 209288, at *2 (S.D.N.Y. Aug. 17, 1992) (denying motion to dismiss claim under DCL 276-a on the ground that it did not state an independent claim because the claim was dependent on plaintiff's ability to prevail on its claim under DCL § 276); *Combina Inc. v. Iconic Wireless Inc.,* No. 4222/2011, 2011 WL 3518185, at *5 (N.Y. Sup. Ct. Aug. 11, 2011) (denying motion to dismiss a claim under DCL § 276-a because the plaintiff adequately pleaded a claim under DCL § 276 and is entitled to assert a claim for attorney fees if the court finds that a fraudulent conveyance was made under DCL § 276); *cf. Picard v. Madoff*, 458 B.R. at 108 n.14 (the plaintiff's request for attorneys' fees under DCL § 276-a is not ripe for determination at the early stage of the case in connection with the defendant's motion to dismiss because attorneys' fees are only recoverable if the plaintiff establishes an actual fraudulent transfer at trial) (quoting *Patriot*, 452 B.R. at 435).

Here, the plaintiff's claim for attorneys' fees is part of the relief sought in Count I.  The Court has concluded that the plaintiff adequately pleaded that claim, and under the authorities cited above, the disposition is sufficient to defeat Westford's motion to dismiss the claim for attorneys' fees.  While the plaintiff must prove Westford's fraudulent intent at trial to recover attorneys' fees under DCL § 276-a, it is premature to dismiss a claim for attorney fees at the pleading stage.

In conclusion, the Motion is granted to the extent of dismissing (1) the portion of Count VI that seeks to avoid and recover the repayment of Westford's principal investment and (2) Count VII.  The Motion is denied in all other respects.  The plaintiff is directed to settle an order consistent with this opinion, and to contact chambers to schedule a pre-trial conference.

Dated: New York, New York
       December 19, 2011

                                        /s/ *Stuart M. Bernstein*
                                         STUART M. BERNSTEIN
                                        United States Bankruptcy Judge