UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------X

In re:                                              :
                                                    :     Chapter 11
           DREIER LLP,                              :     Case No. 08-15051 (SMB)
                                                    :
                                Debtor.             :
----------------------------------------------------------------X
SHEILA M. GOWAN, Chapter 11 Trustee for            :
DREIER LLP,                                          :
                                                    :
                                Plaintiff,          :
                                                    :
                     -against-                      :     Adv. Proc. No. 10-03493 (SMB)
                                                    :
AMARANTH ADVISORS L.L.C., and                       :
AMARANTH PARTNERS LLC,                              :
                                                    :
                                Defendants.         :
----------------------------------------------------------------X
SHEILA M. GOWAN, Chapter 11 Trustee                 :
for the Estate of Dreier LLP,                       :
                                                    :
                                Plaintiff,          :
                                                    :
                     -against-                      :     Adv. Proc. No. 10-05447(SMB)
                                                    :
WESTFORD ASSET MANAGEMENT LLC,                      :
*et al.*,                                           :
                                                    :
                                Defendants.         :
----------------------------------------------------------------X

## MEMORANDUM DECISION DENYING
## MOTIONS FOR PARTIAL SUMMARY JUDGMENT

**A P P E A R A N C E S:**

REID COLLINS & TSAI LLP
1601 Elm St., 49th Floor
Dallas, TX 75201

           J. Benjamin King, Esq.
                Of Counsel

– and –

DIAMOND McCARTHY LLP
620 Eighth Avenue, 39th Floor
New York, NY 10018

    Howard D. Ressler, Esq.
    Steven T. Loden, Esq.
        Of Counsel

*Attorneys for Plaintiff, Sheila M. Gowan,*
  *Chapter 11 Trustee for the Estate of Dreier LLP*

WINSTON & STRAWN LLP
200 Park Avenue
New York, NY 10166

    Steven Schwartz, Esq.
    Robert Michels, Esq.
    Stephen Senderowitz, Esq.
    Beth A. Tagliamonti, Esq.
        Of Counsel

*Attorneys for Defendants Amaranth Advisors L.L.C., and*
  *Amaranth Partners LLC*

JONES DAY
222 East 41st Street
New York, NY 10017

    Steven C. Bennett, Esq.
    Howard F. Sidman, Esq.
    Michael D. Silberfarb, Esq.
    Tobias S. Keller, Esq.
        Of Counsel

*Attorneys for Defendants Westford Asset*
  *Management, LLC, et al.*

**STUART M. BERNSTEIN**
**United States Bankruptcy Judge:**

      Sheila M. Gowan, the chapter 11 trustee of the estate of Dreier LLP (the "plaintiff" or

"Trustee"), commenced these two adversary proceedings (hereinafter the "Amaranth

Proceeding" and the "Westford Proceeding") to recover transfers made in connection with a

Ponzi scheme allegedly conducted by Marc S. Dreier ("Marc"), the sole equity partner of Dreier

LLP.  The plaintiff has moved for partial summary judgment in each proceeding to recover the

"profits" that the transferees received.[1]  (*Trustee's Motion for Partial Summary Judgment*

*Against Amaranth Partners LLC*, dated Dec. 21, 2012 ("*Amaranth Motion*") (ECF Amaranth

Doc. # 96); *Trustee's Motion for Partial Summary Judgment Against Certain Westford*

*Defendants* (ECF Westford Doc. # 60) ("*Westford Motion*," and collectively with the *Amaranth*

*Motion*, the "*Motions*").)[2]  Certain of the defendants in the Westford Proceeding have cross-

moved to dismiss the adversary proceeding (the "*Cross Motion*").  (*Notice of Westford*

*Defendants' Motion for Partial Summary Judgment*, dated Feb. 8, 2013 (ECF Westford Doc. #

76).)

The *Motions* turn on whether the Trustee has established as a matter of law that Marc ran

a Ponzi scheme and made transfers to the defendants in connection with that scheme.  Although

much has been written and said over the past five years about Marc and his activities, including

by Marc himself, my review is limited to the record presented on each *Motion*.  In each case, the

record is not sufficient to conclude as a matter of law that Marc conducted a Ponzi scheme or

made the transfers in connection with a Ponzi scheme, and accordingly, the *Motions* are denied.

---

[1]    The defendants dispute whether they received "profits" or "interest."  The dispute is not material to this decision.  I use the term "profits" to refer to the amount received by the transferees in excess of the amount they transferred in connection with the purchase of the Solow Notes discussed in the text.  Similarly, the defendants dispute that they are "investors," preferring the description "lenders."  Once again, the dispute is not material to this decision, and "investor" refers to any party that purchased or received payments in connection with a Solow Note.

[2]    "ECF Amaranth Doc." refers to the electronic docket in the Amaranth Proceeding and "ECF Westford Doc." refers to the electronic docket in the Westford Proceeding.  Several of the background documents, such as the Indictment and the Allocution, were filed by the Trustee in both adversary proceedings.  In many cases, the Court has cited to only one docket, but to ensure a complete record, the reference includes the identical document filed in the other adversary proceeding.

The *Cross-Motion* contends that the Trustee cannot establish that certain of the Westford Defendants were subsequent transferees of the transfers that form the basis of the Westford Proceeding.  Part of the *Cross-Motion* was resolved through a stipulation dismissing the adversary proceeding as to certain Westford Defendants with prejudice.  (*Agreed Stipulation of Dismissal with Prejudice*, dated Apr. 15, 2013 ("*Agreed Stipulation*") (ECF Westford Doc # 97).)  Three cross-moving Westford Defendants remain, and the *Cross-Motion* is denied as to them.

## BACKGROUND

The general facts relating to Marc's alleged scheme are common to both proceedings. Until his arrest in December 2008, Marc practiced law as the sole equity partner in Dreier LLP. He also engaged in a scheme to sell forged notes ostensibly issued by Solow Realty & Development Company, LLC ("Solow").  Each Solow Note appeared to be signed by Steven M. Cherniak, Solow's Chief Executive Officer.  In fact, Cherniak's signature was forged by or at the behest of Marc.  The proceeds derived from selling a Solow Note were generally deposited into a Dreier LLP Attorney Trust Account at J.P. Morgan Chase ("Account 5966"), but sometimes later transferred to other Dreier LLP accounts.  Principal and interest were generally paid from Account 5966.

Marc's note fraud scheme unraveled in December 2008 leading to his arrest.  On December 16, 2008, the receiver appointed by the United States District Court for the Southern District of New York filed a chapter 11 petition on behalf of Dreier LLP, and Sheila M. Gowan, Esq. was appointed chapter 11 trustee.  Marc was subsequently indicted by the United States Attorney for the Southern District of New York, and on March 17, 2009, the Government filed a superseding eight count indictment that charged Marc with conspiracy, securities fraud, wire

4

fraud and money laundering.  (*December 21, 2012, Declaration of J. Benjamin King Submitted in Support of the Trustee's Motion for Partial Summary Judgment Against Amaranth Partners LLC*, dated Dec. 21, 2012 ("*King Amaranth Declaration*"), Ex. 1 (the "Indictment") (ECF Amaranth Doc. # 96-2.)  The conspiracy count charged that:

> Beginning in or about 2004, MARC DREIER, the defendant, falsely represented to various hedge funds and investment funds (the "Funds") and others that he had authority to sell promissory notes (the "False Developer Notes") issued by a real estate development company headquartered in New York, New York (the "Developer").  DREIER further represented to the Funds that the proceeds of the sale of the False Developer Notes would be used to finance investments in real estate projects located in the United States and abroad.

(Indictment ¶ 5.)  The Indictment also alleged what Marc did with the proceeds received from the sale of the bogus notes:

> MARC DREIER, the defendant, used the proceeds of the sale of these notes to, among other things, purchase personal assets for himself, including numerous homes, a yacht, several vehicles, and expensive art work, fund the operations of his law firm, pay interest and principal back to certain previous purchasers of the notes, and pay his co-conspirators.

(Indictment ¶ 16.)

On May 11, 2009, Marc pled guilty to every count in the Indictment.  (*King Amaranth Declaration*, Ex. 2 (the "Allocution").)  During the Allocution, Marc admitted that beginning in or about 2004, but no later than November 2004, he engaged in a scheme to issue and sell fictitious promissory notes by falsely representing to potential investors that he had the authority to issue promissory notes on behalf of a New York real estate development company (*i.e.*, Solow).  (Allocution at 14-15.)  He made transfers of the proceeds of his unlawful activity "into and disbursements out of various Dreier LLP bank accounts . . . with the intent to promote the carrying on of additional fraud."  (*Id.* at 16.)  The District Court accepted Marc's guilty plea and entered a judgment on July 17, 2009 in which it sentenced him to a period of incarceration of 20

years and directed him to pay restitution in the sum of $387,675,303.  (*King Amaranth Declaration*, Ex. 3.) **A.      Amaranth**

The information regarding the transactions between the various defendants and Dreier LLP comes from bank and other records and analysis of those records provided by the Trustee's attorney.  The Trustee did not offer an expert report.

On or about November 16, 2004, Amaranth Partners LLC ("Partners") purchased a $25 million note ostensibly issued by Solow.  (*Declaration of Robert L. Michels Submitted in Support of Amaranth Partners LLC's Opposition to the Trustee's Motion for Partial Summary Judgment*, dated Feb. 15, 2013 (the "*Michels Declaration*"), Ex. 1 (ECF Amaranth Doc. # 102).) The note matured in one year, and paid quarterly interest at the annual rate of 8%.  The $25 million in proceeds was deposited into Account 5966.  (*See King Amaranth Declaration*, Ex. 8 at Bates No. DR1749.)  Partners thereafter agreed to extend the term of the note for 90 days at an increased interest rate of 9%, evidenced by a new note, (*see Michels Declaration*, Ex. 8), and on February 16, 2006, Partners agreed to further extend the term of the note for an additional 45 days at an increased interest rate of 12% retroactively applicable to the entire 135-day extension. This extension was evidenced by an Amended and Restated Term Note, dated Feb. 15, 2006. (*See id.*, Ex. 10.)

Partners received several transfers keyed to the interest called for by the Solow Note, and ultimately, the return of principal.  All of the transfers to Partners were made from Account 5966.  The following table summarizes the transfers between Dreier LLP and Partners:

| Date of Transfer | Transfer to Dreier LLP ($) | Transfers to Partners ($) |
|---|---|---|
| 11/16/2004 | 25,000,000.00 | |
| 2/16/2005 | | 500,000.00 |
| 5/20/2005 | | 505,479.55 |
| 8/16/2005 | | 500,000.00 |
| 11/16/2005 | | 500,000.00 |
| 2/16/2006 | | 750,000.00 |
| 4/3/2006 | | 25,000,000.00 |
| 4/3/2006 | | 395,000.00 |

Prior to the April 3, 2006 transfers, and as of March 27, 2006, the balance in Account 5966 was approximately $500,000. (*King Amaranth Declaration*, Ex. 8 at Bates No. DR2246.) On March 28, 2006, Account 5966 received a $25 million transfer from GSO Special Situations Fund LP ("GSO"). (*Id.*, Ex. 8 at Bates No. DR2263.) That transfer corresponds to a Solow Note purchase by GSO in the sum of $25 million. (*See id.*, Ex. 5 at Bates Nos. DLLP4335-37.)

On March 28, 2006, Account 5966 received three more transfers aggregating $5 million ($3.1 million, $1 million and $900,000). (*Id.*, Ex. 8 at Bates No. DR2246.) In her reply, the Trustee offered evidence that the transfers corresponded to three Solow Notes executed on March 29, 2006 in favor of Context Advantage Master Fund LP or Context Opportunistic Master Fund LP (collectively "Context"). (*March 8, 2013, Declaration of J. Benjamin King Submitted in Support of the Trustee's Motion for Partial Summary Judgment Against Amaranth Partners LLC*, dated Mar. 8, 2013, Ex. 15 at Bates Nos. DLLP16509-14, DLLP16528-30 (ECF Amaranth Doc. # 105).)

On April 3, 2006, and prior to the transfers to Partners, Account 5966 also received a $19.9 million transfer. (*King Amaranth Declaration*, Ex. 8 at Bates No. DR1924.) The Trustee offered evidence that Novator Credit Luxembourg SARL ("Novator") purchased a $20 million Solow Note on March 29, 2006. (*Id.*, Ex. 5 at Bates No. DLLP1395-97.) Between the receipt of

7

the GSO funds and the funds the Trustee attributes to Context on March 28, 2006, and the April 3, 2006 payments to Partners, Account 5966 received additional deposits in the amount of $450,416.21 (exclusive of the $19.9 million that the Trustee attributes to Novator) and paid out $5,526,817.05.  (*See id.*, Ex. 8 at Bates Nos. DR1924, DR2246.)

## B.    The Westford Proceeding

### 1.    The Solow Note Purchases

The transactions involving the Westford Defendants were more numerous and complex. The Westford Defendants consist of funds, special purpose entities, management companies and Steve Stevanovich.  The funds include Westford Special Situations Master Fund L.P. ("Special Situations Master"), Epsilon Global Master Fund, LP ("Epsilon Global I"), Epsilon Global Master Fund II, LP ("Epsilon Global II"), and Epsilon Distressed Strategies Master Fund, LP ("Epsilon Distressed") (sometimes collectively referred to as the "Funds").  The defendant Westford Special Situations Fund, Ltd. is also a fund.  (*See* Videotaped Deposition of Steve G. Stevanovich, held June 15, 2012 ("*Stevanovich Deposition*"), at 39:6-12; 40:1-18.)[3]  The Westford special purpose entities include Adams International Trading, Ltd. ("Adams"), Stafford Towne, Ltd. ("Stafford"), Bennington International Holdings, Ltd. ("Bennington") and Carston Spires, Ltd. ("Carston") (sometimes collectively referred to as the "SPEs").  The Funds and SPEs are managed by the defendants Westford Asset Management LLC, SGS Asset Management and/or Westford Global Asset Management Ltd. (sometimes collectively referred to as the "Managers").  (*Id.* at 29:1-9.)  Stevanovich is the president of each Manager.  (*Declaration of*

---

[3]        The *Stevanovich Deposition* is annexed as Exhibit G.2 to the *Declaration of Bart Green Submitted in Support of Westford Defendants' Memorandum in Opposition to Trustee's Motion for Partial Summary Judgment and Westford Defendants' Motion for Partial Summary Judgment*, dated Feb. 8, 2018 ("*Green Declaration*") (ECF Westford Doc. # 80).

*Steve Stevanovich*, dated Feb. 8, 2013 ("*Stevanovich Declaration*"), at ¶ 1 (ECF Westford Doc. # 84).)

Each SPE is apparently owned by and/or acts as agent for a particular Fund.  The following chart depicts these relationships:

| Fund | Corresponding SPE |
|------|-------------------|
| Special Situations Master | Adams |
| Epsilon Global I | Stafford |
| Epsilon Global II | Bennington |
| Epsilon Distressed | Carston |

(*See Stevanovich Deposition* at 33:3-8; 251:9-253:12); *Stevanovich Declaration*, Ex. S.20 (Dec. 28, 2006 email from Alex Mantecon to Marc Dreier and Michael D. Zalk).)

The case against the Funds arises from the purchase of seven series of Solow Notes funded by an SPE or Special Situations Master in the aggregate amount of $115 million.  The following chart summarizes the information relevant to each series of Solow Notes and their purchase:

| Series | Date of Issuance | Investor | Amount of Note ($) | Total Investment ($) |
|--------|------------------|----------|--------------------|----------------------|
| 1 | 1/7/04 | Special Situations Master[4] Stafford Bennington | 2,500,000 5,000,000 7,500,000 | 15,000,000 |
| 2 | 6/24/04 | Special Situations Master Stafford Bennington | 750,000 3,750,000 10,500,000 | 15,000,000 |
| 3 | 1/14/05 | Special Situations Master | 2,000,000 | 30,000,000 |

---

[4]    This Solow Note was actually issued to Westford Special Situations Fund, Ltd. rather than Special Situations Master.  (*See January 29, 2013 Declaration of J. Benjamin King Submitted in Support of the Trustee's Motion for Partial Summary Judgment Against Certain Westford Defendants*, dated Jan. 29, 2013, Ex. 6 at Bates Nos. WAM4436-37 (ECF Westford Doc. # 72).)  According to the Trustee, the lender was subsequently changed to Special Situations Master.  (*See December 21, 2012 Declaration of J. Benjamin King Submitted in Support of the Trustee's Motion for Partial Summary Judgment Against Certain Westford Defendants*, dated Dec. 22, 2012 ("*King Westford Declaration*"), Ex. 9 at Bates Nos. DLLP_EMAILS_IM356-59  (ECF Westford Doc. #60).)

9

| | | Stafford | 18,000,000 | |
| | | Bennington | 10,000,000 | |
| 4 | 2/10/06 | Special Situations Master | 250,000 | 5,000,000 |
| | | Stafford | 1,250,000 | |
| | | Bennington | 3,500,000 | |
| 5 | 6/29/06 | Special Situations Master | 10,000,000 | 10,000,000 |
| 6 | 12/29/06 | Adams | 2,825,000 | 20,000,000 |
| | | Adams | 8,475,000 | |
| | | Stafford | 450,000 | |
| | | Stafford | 150,000 | |
| | | Bennington | 4,500,000 | |
| | | Bennington | 1,500,000 | |
| | | Carston | 1,575,000 | |
| | | Carston | 525,000 | |
| 7 | 3/30/07 | Adams | 9,000,000 | 20,000,000 |
| | | Stafford | 4,000,000 | |
| | | Bennington | 7,000,000 | |

(*Stevanovich Declaration*, Exs. S.1-30.)  All of the investment proceeds were initially deposited into Account 5966.  (*Green Declaration*, Ex. G.19 (*Expert Report of John D. Dempsey* ("*Dempsey Report*") at 3.)

Each Solow Note designated an account to which Solow was directed to send interest and principal payments.  In many cases, the Solow Notes attached to the *Westford Motion* redacted some of the account information and the Trustee's attorney deduced the identity of the transferee from other bits of information.  For example, the notes that named Stafford as the lender directed payment to a Goldman Sachs account ending in 9920 that appears to be maintained for the benefit of Epsilon Global I.  (*See King Westford Declaration*, Ex. 8 at Bates Nos. DR292, DR624, DR2568.)  The notes that named Bennington as the lender directed payment to a Goldman Sachs account ending in 7302 that appears to be maintained for the benefit of Epsilon Global II.  (*See id.*, Ex. 8 at Bates Nos. DR623, DR2569.)  The notes that named Adams or Special Situations Master as the lender directed payment to a Goldman Sachs account ending in 1870 that appears to be maintained for the benefit of Special Situations Master.  (*Id.*, Ex. 8 at

Bates Nos. DR2570, DR2674, DR4483; *id.*, Ex. 9 at Bates Nos. DLLP_EMAILS_IM 000356-59.)  Finally, the notes that named Carston as the lender directed payments to a Goldman Sachs account ending in 3460.  The Trustee contends that this account is maintained for the benefit of Epsilon Distressed, but she did not submit evidence (or I could not locate it in the mass of evidence she did submit) to support this contention.

## 2.    The Transfers to the Funds

Dreier LLP made all of the transfers to the Funds from Account 5966.  (*Dempsey Report* at 3.)  The Trustee has attempted to track every interest and principal payment made to each Fund and link each payment to a specific Solow Note.  In total, the Trustee has identified 160 transfers made on 35 days between January 8, 2004 and April 15, 2008.  (*See generally Statement of Undisputed Material Facts Pursuant to Local Rule 7056-1(b) in Support of the Trustee's Motion for Partial Summary Judgment Against Certain Westford Defendants*, dated Dec. 22, 2012 ("*TSOF*"), at ¶¶ 24, 29, 37, 42 (ECF Westford Doc. # 60-1.)  The Funds dispute that the Trustee identified the reason for any particular transfer or the transferee.  (*See Westford Defendants' Statement of Additional Material Facts Precluding the Trustee's Motion for Partial Summary Judgment and Response to the Trustee's Statement of Undisputed Material Facts in Support of the Trustee's Motion for Partial Summary Judgment of the Trustee's Adversary Complaint*, dated Feb. 8, 2013 ("*WSOF*"), at ¶¶ 24, 29, 37, 42 (ECF Westford Doc. # 75).) [5]

---

[5]     Although the Trustee has attempted to link specific payments to specific notes, linkage is unnecessary. Under the net investment approach relied on by the Trustee and discussed in a later footnote, the Court would compute the profit by subtracting the total investment made by or on behalf of a Fund (or its assignor) from the total amount transferred to that Fund.  Mark A. McDermott, *Ponzi Schemes and the Law of Fraudulent and Preferential Transfers*, 72 AM. BANKR. L.J. 157, 169 (Spring 1998) ("[A] trustee need only determine whether an investor was a net-winner or net-loser when ascertaining whether the investor received profit; the trustee need not match-up each investment with each payment made by the debtor and follow the parties' characterizations of the transfers.").

The Trustee is seeking to recover the profits received by the Funds. Focusing on 26 transfers made on six transfer dates, she contends that the Funds received $34,523,500.76 in excess of their investments, as follows:

| Transfer Date | Profits ($) | Transferee |
|---|---:|---|
| 1/17/06 | 14,791.67 | Epsilon Global I |
| 12/29/06 | 4,723,194.44 | Epsilon Global I |
| 12/29/06 | 7,002,250.00 | Epsilon Global II |
| 12/28/07 | 474,833.33 | Epsilon Distressed |
| 12/28/07 | 5,399,652.79 | Special Situations Master |
| 3/31/08 | 854,666.67 | Special Situations Master |
| 4/1/08 | 4,931,666.67 | Special Situations Master |
| 4/15/08 | 11,122,445.19 | Special Situations Master |

(*TSOF* ¶ 44.) Without identifying which entity received which transfer, Westford admits that the Funds received $23,854,113 in the aggregate in excess of the principal amount paid for the Solow Notes. (*Green Declaration*, Ex. G.20 ((Ex. H to *Dempsey Report*) at 4-5).)

## 1.    January 17, 2006 Transfers

Dreier LLP made two transfers from Account 5966 in the aggregate amount of $18,475,000 to Account 9920. (*Dec. 21 King Westford Declaration*, Ex. 8 at Bates Nos. DR2742-43, DR2791, DR2795-96, DR2799.) As noted, Epsilon Global I appears to be the beneficial owner of that account. The Trustee contends that these two payments were the only payments made to Epsilon Global I on account of Solow Note 3 (the $18 million note purchased by Stafford). (*TSOF* ¶ 29.)

The bank records show that immediately prior to the first transfer, the balance in Account 5966 was $30,831,620.80. (*King Westford Declaration*, Ex. 8 at Bates Nos. DR2742-43.) According to the Trustee, this balance was primarily attributable to the proceeds paid by Fortress Credit Corporation LLC ("Fortress") for a fraudulent Solow Note. The evidence indicated that

Fortress had made an ostensible loan to Solow in the sum of $25 million on January 6, 2006, (*id.*, Ex. 5 at Bates No. DLLP51), the loan closed and was disbursed on January 13, 2006 in the amount of $24,971,250, (*id.*, Ex. 5 at Bates No. DLLP172), and the same day Fortress transferred $24,971,250 to Account 5966. (*Id.*, Ex. 8 at Bates No. DR2803.) In addition, on January 17, 2006, and immediately prior to the transfers to Account 9920, an additional $2,024,180.09 was transferred into Account 5966, (*id.*, Ex. 8 at Bates No. DR2742-43), but the Trustee has not identified the source of these deposits.[6]

### 2.    December 29, 2006 Transfers

On December 29, 2006, Dreier LLP made six transfers from Account 5966 to Account 9920 (*i.e.*, Epsilon Global I) in the aggregate amount of $5,280,104.17. (*Id.*, Ex. 8 at Bates Nos. DR4941-42, DR4951-52, DR4970, DR4973-74, DR4977-78, DR4981, DR4983, DR4986.) The Trustee contends that these transfers pertained to interest, fees and principal payments made in connection with Solow Notes 2, 4 and 6. (*TSOF* ¶ 29.)

On the same day, Dreier LLP also made five transfers to Account 7302 in the aggregate amount of $14,854,791.67. (*King Westford Declaration*, Ex. 8 at Bates Nos. DR4949-50, DR4971, DR4973, DR4975, DR4977, DR4979, DR4981, DR4984.) As noted, Epsilon Global II appears to be the ultimate beneficiary of this account, and the Trustee also attributes these

---

[6]    According to the Trustee, $10 million was transferred from Xerion Master Fund II ("Xerion") to Account 5966 on December 21, 2005. While the Trustee supplied evidence that Xerion acquired a $10 million Solow Note on December 21, 2005, (*King Westford Declaration.*, Ex. 9 at Bates Nos. DLLP_EMAILS_IM3785-91), she did not provide the December 2005 bank statement, and failed, therefore, to show that the $10 million was deposited into Account 5966. Furthermore, the balance on January 3, 2006 was approximately $4 million, (*id.*, Ex. 8 at Bates No. DR2743), and if the Trustee is right, a substantial amount was withdrawn from Account 5966 between the Xerion and Fortress transfers.

13

transfers to interest, fees and principal payments made in connection with Solow Notes 2, 4 and 6.  (*TSOF* ¶ 37.)

The balance in Account 5966 immediately prior to the approximate $20 million in transfers made on December 29, 2006 was $23,970,654.53.  (*King Westford Declaration*, Ex. 8 at Bates No. DR4934-36.)  The Trustee attributes this balance to a $60 million Solow Note purchased by Fortress on December 19, 2006, (*id.*, Ex. 5 at Bates Nos. DLLP1847-51), but the bank records reflect a transfer to Account 5966 of $34,973,908.65 on the date of the Fortress purchase.  (*Id.*, Ex. 8 at Bates Nos. DR4936, DR5016.)

On December 29, 2006, and prior to the transfers targeted by the Trustee, $20 million was wired into Account 5966.  (*Id.*, Ex. 8 at Bates Nos. DR4935.)  The wire originated from an Oppenheimer account.  (*Id.*, Ex. 8 at Bates Nos. DR4940.)  The Trustee attributed the Oppenheimer transfer to the purchase of the sixth series of Solow Notes by Adams/Special Situations Master ($11.3 million) (*see TSOF* ¶¶ 21 (citing DR4940), 24), Stafford/Epsilon Global I ($600,000) (*see TSOF* ¶ 29 (citing DR 4940)), Bennington/Epsilon Global II ($6 million) (*see TSOF* ¶ 37 (citing DR4940)) and Carston/Epsilon Distressed ($ 2.1 million) (*see TSOF* ¶ 41 (citing DR4940)).  In other words, the Funds as a group funded the December 29, 2006 payments to themselves.

### 3.    December 28, 2007 Transfers

On December 28, 2007, Dreier LLP made six transfers from Account 5966 to Account 1870 in the aggregate amount of $17,479,277.78.  (*Id.*, Ex. 8 at Bates Nos. DR7634-35, DR7637, DR7640-42, DR7645-46, DR7648.)  As noted, the Trustee has submitted evidence that the beneficial owner of the account is Special Situations Master.  The Trustee attributes these

14

payments to interest, fees and the return of principal on Solow Note 6 and interest and fees in

connection with Solow Note 7.[7]  (*TSOF* ¶ 24.)

On the same day, Dreier LLP made two transfers aggregating $2,205,583.33 from

Account 5966 to Account 3460, (*King Westford Declaration*, Ex. 8 at Bates Nos. DR7636-37,

DR7647-48), allegedly on account of Solow Note 6.  (*TSOF* ¶ 42.)  The Trustee contends that

Epsilon Distressed is the beneficial owner of Account 3460, but as discussed earlier, she did not

submit evidence to support this contention, and hence, failed to identify the transferee.

As of November 16, 2007, the balance in Account 5966 stood at approximately

$415,280.18, (*King Westford Declaration*, Ex. 8 at Bates Nos. DR7876-77), but immediately

prior to the December 28, 2007 transfers, the balance in Account 5966 had increased to

$26,119,553.43.  (*Id.*, Ex. 8 at Bates Nos. DR7617-7621.)  The Trustee linked the increase to two

deposits.  On November 19, 2007, Account 5966 received a $5 million deposit from Xerion

Master Fund II, Ltd ("Xerion").  (*Id.*, Ex. 8 at Bates Nos. DR7877, DR7907.)  The Trustee

suggests that this deposit represented the proceeds of a Solow Note investment, but she did not

supply the underlying documentation connecting the $5 million deposit with an investment.  In

addition, on December 26, 2007, Account 5966 received two transfers aggregating $23.9 million

($14.6 and $9.3 million) from two different Dreier LLP accounts at Wachovia National Bank.

(*Id.*, Ex. 9 at Bates No. DLLP_EMAILS_IM 18979; *id.*, Ex. 8 at Bates No. DR7619; *id.*, Ex. 5 at

Bates No. DLLP71578.)

---

[7]      The Trustee contends that Epsilon Global II transferred two Solow Notes issued on December 29, 2006 (Series 6) to Special Situations Master in September 2007, and instructed Marc to make payments under those notes to Special Situations Master.  (*TSOF* ¶ 22.)  The Court could not locate the supporting document "WAM2529" cited by the Trustee in the documents filed on the Court's ECF, and the other two documents cited by the Trustee did not support the Trustee's statement.

The Trustee contends that the source of the funds that Wachovia transferred was Solow Note proceeds.  The Court will return to this contention later.

### 4.    March 31, 2008 Transfers

On March 31, 2008, Dreier LLP made two transfers from Account 5966 to Account 1870 (a Special Situations Master account), (*id.*, Ex. 8 at Bates Nos. DR8292-93, DR8298), and two transfers from Account 5966 to a Credit Suisse account ending in 3720.  (*Id.*, Ex. 8 at Bates Nos. DR8294-95.)  The Trustee implies that Account 3720 is a Special Situations Master account, but she did not discuss this account in the *Westford Motion* and did not supply evidence that it is a Special Situations Master account.   The aggregate amount of these four transfers was $854,666.67,  (*id.*, Ex. 8 at Bates Nos. DR8292-93, DR8294-95, DR8298), and the Trustee linked these payments to Solow Note 7.  (*TSOF* ¶ 24.)

As of March 12, 2008, the balance in Account 5966 was approximately $4.8 million.  (*King Westford Declaration*, Ex. 8 at Bates No. DR8267.)  The next day, $5,685,500 was wired into Account 5966 from a Dreier LLP account at Wachovia.  (*Id.*)  On March 27, 2008, Account 5966 received a $5 million wire from Wilmington Trust, which apparently represented client funds.  (*Id.*, Ex. 8 at Bates Nos. DR8265-66, DR8318-19.)  Between March 27, 2008 and March 28, 2008, the balance in Account 5966 fell to approximately $2.5 million.  (*Id.*, Ex. 8 at Bates No. DR8265.)  On March 31, 2008, and prior to the transfers to Account 1870 and Account 3720, $1 million was wired into Account 5966 from a Dreier LLP Wachovia account.  (*Id.*)

The Trustee suggests that the March 31, 2008 transfers to the Funds were funded with the Wilmington deposit and the two Wachovia wires aggregating $6,685,500.  Furthermore, the Wachovia wires represented the proceeds of Solow Note purchases made by Eton Park

16

Management 1, Eton Park Management 2, Eton Park Fund L.P., and Eton Park Master Fund Ltd.

(collectively "Eton").  According to records supplied by the Trustee, Eton assumed and accepted

a $40 million Solow Note that named Stafford as the lender.  (*See id.*, Ex. 5 at Bates Nos.

DLLP33892-97.)[8]  Account 5966 received four wire transfers from Eton in the aggregate amount

of $38.8 million on March 10, 2008.  (*Id.*, Ex. 8 at Bates Nos. DR8268-69, DR8417-20.)  That

same day, $38.5 million was transferred from Account 5966 to a Dreier LLP Wachovia bank

account.  (*Id.*, Ex. 8 at Bates Nos. DR8268, DR8414-15.)  As noted, the aggregate sum of

$6,686,500 was transferred from the Wachovia account to Account 5966 on March 13, 2008 and

March 31, 2008.  (*Id.*, Ex. 8 at Bates Nos. DR8264-67.)

  5.  **April 1, 2008**

As of the close of business on March 31, 2008, the balance in Account 5966 stood at only

$58,749.48.  (*Id.,* Ex. 8 at Bates No. DR8264.)  On April 1, 2008, Dreier LLP transferred $14

million from a Dreier LLP Wachovia account to Account 5966, (*id.*, Ex. 8 at Bates Nos.

DR9426, DR9728), and later that day, made two transfers in the aggregate amount of

$4,931,666.66 from Account 5966: $1 million to Account 1870 (a Special Situation Masters

account), (*id.*, Ex. 8 at Bates Nos. DR9426-27, DR9724), and $3,931,666.66 to Account 3720

(*id.*, Ex. 8 at Bates Nos. DR9426-27, DR9725), an account that the Trustee also attributes to

Special Situations Master.  She linked these transfers to Solow Note 7.  (*TSOF* ¶ 24.)  As with

the transfers of the preceding day, the Trustee maintains that the amount transferred from the

Wachovia account represented the proceeds of the Eton funds.

---

[8]    The $40 million Solow Note was apparently issued on or about January 4, 2008.  (*See id.*, Ex. 5 at Bates
No. DLLP33896.)  This note does not otherwise figure into the Trustee's case and is not included in the seven series
of Solow Notes discussed in the body of this decision.

17

6.    **April 15, 2008**

On April 15, 2008, Dreier LLP made a single transfer in the amount of $11,122,445.19 from Account 5966 to Account 3720, (*King Westford Declaration*, Ex. 8 at Bates Nos. DR9482-83), allegedly in final repayment of the principal and interest due on Solow Note 7.  As noted, the Trustee did not provide evidence identifying the owner of this account.

In addition, the Trustee did not provide bank records for Friday, April 11, 2008 or Monday April 14, 2008, but it appears that earlier on April 15, 2008, the balance in Account 5966 was approximately $4,557,089.91.  (*See id.*, Ex. 8 at Bates No. DR9415.)  Prior to the transfer to Account 3720, Account 5966 received three transfers in the sums of $4.9 million, $1.6 million and $200,000, the latter two coming from a Dreier LLP Wachovia account.  (*See id.*)  The Trustee attributes the $4.9 million wire to the proceeds of a purchase of a Solow Note by Xerion.  The Trustee did supply evidence that Xerion purchased a $5 million Solow Note on April 15, 2005, (*id.*, Ex. 9 at Bates Nos. DLLP_EMAILS_IM 20821-32), but no proof that the $4.9 million wired into Account 5966 came from Xerion.

## DISCUSSION

A.    **Standard Governing Summary Judgment**

The Trustee has moved for partial summary judgment contending that she is entitled to the presumption that the transfers received by the defendants were made with actual fraudulent intent, and she is entitled to recover, at a minimum, the profits that each transferee received. Rule 56 of the Federal Rules of Civil Procedure, made applicable to this adversary proceeding by FED. R. BANKR. P. 7056, governs summary judgment motions.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the

movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).[9]  The moving party

bears the initial burden of showing that the undisputed facts entitle it to judgment as a matter of

law.  *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-61 (2d Cir. 1995).  If the movant carries

this initial burden, the nonmoving party must set forth specific facts that show triable issues, and

cannot rely on pleadings containing mere allegations or denials.  *Matsushita Elec. Indus. Co. v.

Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986); *see Celotex Corp. v. Catrett*, 477 U.S. 317,

324 (1986).  In deciding whether material factual issues exist, all ambiguities must be resolved

and all reasonable inferences must be drawn in favor of the nonmoving party.  *Matsushita Elec.*,

475 U.S. at 587.

## B.     The Ponzi Scheme Presumption

"A 'Ponzi scheme' typically describes a pyramid scheme where earlier investors are paid

from the investments of more recent investors, rather than from any underlying business concern,

until the scheme ceases to attract new investors and the pyramid collapses." *Eberhard v. Marcu*,

530 F.3d 122, 132 n.7 (2d Cir. 2008); *accord In re Bernard L. Madoff Inv. Secs. LLC*, 654 F.3d

229, 232 (2d Cir. 2011), *cert. denied*, 133 S. Ct. 25 (2012); *see United States v. Moloney*, 287

F.3d 236, 242 (2d Cir.) ("A Ponzi scheme by definition uses the purportedly legitimate but

actually fraudulently obtained money to perpetuate the scheme, thus attracting both further

investments and, in many cases, new investors to defraud."), *cert. denied*, 537 U.S. 951 (2002).

Some courts have discussed a four factor test:

> 1) deposits were made by investors; 2) the Debtor conducted little or no legitimate
> business operations as represented to investors; 3) the purported business

---

[9]      The *Motions* are governed by the amendments to Rule 56 that became effective on December 1, 2010.
Although some language has changed, the standard for granting summary judgment remains unchanged and the
amendments will not "affect continuing development of the decisional law construing and applying these phrases."
FED. R. CIV. P. 56 advisory committee's note (2010).

operation of the Debtor produced little or no profits or earnings; and 4) the source
of payments to investors was from cash infused by new investors.

*Armstrong v. Collins*, 01 Civ. 2437 (PAC), 2010 WL 1141158, at *22 (S.D.N.Y. Mar. 24, 2010)

(quoting *Forman v. Salzano (In re Norvergence, Inc.)*, 405 B.R. 709, 730 (Bankr. D.N.J. 2009)

(quoting *Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 630 (Bankr. S.D. Ohio

2006)); *accord Carney v. Lopez*, 933 F. Supp. 2d 365, 379 (D. Conn. 2013); *Wiand v.*

*Waxenberg*, 611 F. Supp. 2d 1299, 1312 (M.D. Fla. 2009); *Kapila v. TD Bank, N.A. (In re*

*Pearlman)*, 440 B.R. 900, 904 (Bankr. M.D. Fla. 2010); *Floyd v. Dunson (In re Ramirez*

*Rodriguez)*, 209 B.R. 424, 431 (Bankr. S.D. Tex. 1997).  Others have identified badges that

weigh in favor of finding a Ponzi scheme, including the absence of any legitimate business

connected to the investment program, the unrealistic promises of low risk and high returns,

commingling investor money, the use of agents and brokers paid high commissions to perpetuate

the scheme, misuse of investor funds, the "payment" of excessively large fees to the perpetrator

and the use of false financial statements.  *See* KATHY BAZOIAN PHELPS & STEVEN RHODES, THE

PONZI BOOK: A LEGAL RESOURCE FOR UNRAVELING PONZI SCHEMES §2.03 [1][b], at 2-8 to 2-9

(2012).

    These badges are, however, merely characteristics of many Ponzi schemes but a Ponzi

scheme can exist without them.  At bottom, the label Ponzi scheme applies "to any sort of

inherently fraudulent arrangement under which the debtor-transferor must utilize after-acquired

investment funds to pay off previous investors in order to forestall disclosure of the fraud."

*Bear, Stearns Secs. Corp. v. Gredd (In re Manhattan Inv. Fund Ltd.)*, 397 B.R. 1, 12 (S.D.N.Y.

2007) (quoting *Bayou Superfund v. WAM Long/Short Fund II, L.P. (In re Bayou Group, LLC)*,

362 B.R. 624, 633 (Bankr. S.D.N.Y. 2007)); *see Armstrong*, 2010 WL 1141158 at * 23 ("[E]ven

assuming Yagalla did not promise or represent high rates of return, this does not mean that he

was not running a Ponzi scheme. 'Case law has revealed that a clever twist on the Ponzi concept

will not remove a fraudulent scheme from the definition of Ponzi.'") (quoting *In re Norvergence*,

405 B.R. at 730).

Once it is determined that a Ponzi scheme exists, all transfers made in furtherance of that

Ponzi scheme are presumed to have been made with fraudulent intent. *Picard v. Merkin (In re*

*Bernard L. Madoff Inv. Secs. LLC)*, No. 11 MC 0012(KMW), 2011 WL 3897970, at *4

(S.D.N.Y. Aug. 31, 2011); *Christian Bros. High Sch. Endowment v. Bayou No Leverage Fund,*

*LLC (In re Bayou Group, LLC)*, 439 B.R. 284, 306 n.19 (S.D.N.Y. 2010); *In re Manhattan Inv.*

*Fund*, 397 B.R. at 8.  As one court explained:

> The logic for applying a presumption of actual intent to defraud in the Ponzi
> scheme scenario is tied to the fact that a Ponzi scheme 'cannot work forever.'
> When the pool of investors runs dry—as it will—the operator knows that the
> scheme will collapse and that those still invested in the enterprise will lose their
> money. 'Knowledge to a substantial certainty constitutes intent in the eyes of the
> law,' and awareness that some investors will not be paid is sufficient to establish
> actual intent to defraud.

*Christian Bros.*, 439 B.R. at 306 n. 19.

The Trustee maintains that she has established as a matter of law that Marc ran a Ponzi

scheme.

## C.    The Trustee's Proof

The first three elements of the four factor test do not require extended discussion.  All

parties agree that Marc was engaged in a fraudulent scheme although the defendants are quick to

point out that while all Ponzi schemes are frauds, not all frauds are Ponzi schemes.  Marc was

raising money by selling fraudulent notes.  He induced investors to believe that they were

investing in Solow's real estate ventures, and according to his Allocution, used false financial

21

statements to perpetuate his scheme.  He also set up meetings between investors and imposters

posing as legitimate representatives of the issuers of the notes (*i.e.*, Solow) or holders of the

notes.  Furthermore, although the defendants argue that Dreier LLP was a legitimate business

that was funded with Solow Note proceeds, the investors did not invest in Dreier LLP and had no

reason to believe they were lending to Dreier LLP.  The Solow Note program, in which they

thought they were investing, was a fiction that had no business operations and no profits.  That

Marc stole their money to fund Dreier LLP as well as his extravagant life style did not turn his

larceny into a loan.

Nevertheless, the Trustee's proof has failed to show as a matter of law that Marc was

repaying old investors with new investor money.   The declarations and evidence submitted by

the Trustee in support of her motion must be admissible in evidence.  *Raskin v. Wyatt Co.*, 125

F.3d 55, 66 (2d Cir. 1997); *see* FED. R. CIV. P. 56(c)(4) ("An affidavit or declaration used to

support or oppose the motion must be made on personal knowledge, set out facts that would be

admissible in evidence, and show that the affiant or declarant is competent to testify on the

matters stated.").  The bulk of her evidence is not.

First, the Indictment is inadmissible, notwithstanding Marc's guilty plea.  *See Levinson v.

Westport Nat'l Bank*, Civ. A. Nos. 3:09cv269(VLB), 2013 WL 2181042, at *2 (D. Conn. May

20, 2013); *United States v. Olivieri*, 740 F. Supp. 2d 414, 418-19 (S.D.N.Y. 2010); *In re

Worldcom, Inc. Secs. Litig.*, No. 02 CIV 3288 DLC, 2005 WL 375315, at *9 (S.D.N.Y. Feb. 17,

2005); *see Ruffalo's Trucking Serv., Inc. v. Nat'l Ben-Franklin Ins. Co.*, 243 F.2d 949, 953 (2d

Cir. 1957) ("The indictment, since it was only hearsay, was clearly inadmissible for any

purpose.")  The Trustee cites contrary authority in this District and elsewhere that a court can

rely on a criminal information or an indictment following a guilty plea or conviction after trial to

22

find that the convicted party ran a Ponzi scheme.  *See In re Manhattan Inv. Fund*, 397 B.R. at 12;

*see also Bauman v. Bliese (In re McCarn's Allstate Fin., Inc.)*, 326 B.R. 843, 851 (Bankr. M.D.

Fla. 2005); *Martino v. Edison Worldwide Capital (In re Randy)*, 189 B.R. 425, 439-40 (Bankr.

N.D. Ill. 1995).  It does not appear, however, that the issue of the admissibility of the indictment

or criminal information was raised or litigated in the cited cases.

Second, Marc's judgment of conviction is admissible but only to prove a fact essential to

the judgment.  FED. R. EVID. 803(22)(C)[10]; *New York v. Hendrickson Bros., Inc.*, 840 F.2d 1065,

1081 (2d Cir.) ("A prior judgment of conviction may be used as prima facie evidence in a

subsequent civil suit only with respect to matters of fact or law 'necessarily decided by the

conviction and the verdict on which it was based.'") (quoting *Emich Motors Corp. v. Gen.

Motors Corp.*, 340 U.S. 558, 569 (1951)), *cert. denied*, 488 U.S. 848 (1988).  Marc could have

pled guilty to conspiracy, securities fraud, wire fraud and money laundering without admitting

that he ran a Ponzi scheme.  The Trustee has not discussed the elements of the crimes to which

Marc pled guilty or explained why the operation of a Ponzi scheme was essential to any of the

counts.  Furthermore, the parties agree that the report rendered by the receiver appointed by the

United States District Court is inadmissible.

---

[10]     Rule 803(22) provides:

The following are not excluded by the rule against hearsay, regardless of whether the declarant is
available as a witness:

. . . .

**(22) Judgment of a Previous Conviction.** Evidence of a final judgment of conviction if:

**(A)** the judgment was entered after a trial or guilty plea, but not a nolo contendere plea;

**(B)** the conviction was for a crime punishable by death or by imprisonment for more than a year;

**(C)** the evidence is admitted to prove any fact essential to the judgment; and

**(D)** when offered by the prosecutor in a criminal case for a purpose other than impeachment, the
judgment was against the defendant.

The pendency of an appeal may be shown but does not affect admissibility.

This leaves the Allocution and the numerous bank and other records discussed earlier.[11] The Allocution is admissible.  *See Bayou Accredited Fund, LLC v. Redwood Growth Partners, L.P.* (*In re Bayou Group, LLC*), 396 B.R. 810, 835 (Bankr. S.D.N.Y. 2008) ("Courts have consistently found that criminal proceeding admissions of a fraudulent scheme to defraud investors made in guilty pleas and plea allocutions are admissible as evidence of 'actual intent' to defraud creditors."), *aff'd in part & rev'd in part on other grounds*, 439 B.R. 284 (S.D.N.Y. 2010).  Marc admitted in the Allocution to the fraudulent note scheme, to the use of false financial statements and, in connection with the money laundering count, that he made "transfers into and disbursements out of various Dreier LLP bank accounts involving the proceeds of fraud, with the intent to promote the carrying on of additional fraud."  (Allocution at 16.)  Marc did not admit, however, that he used the proceeds of the fraud to pay back earlier investors, as the Indictment charged, and the Trustee has not pointed to any admissible evidence in which he did admit to operating a Ponzi scheme.

Furthermore, the cases cited by the Trustee to support her argument that the Court may award summary judgment in a fraudulent transfer action involving a Ponzi scheme, (*see Amaranth Motion* at 6, 9; *Westford Motion* at 8-9, 12), are distinguishable.  In several, the perpetrator admitted in words or substance that he ran a Ponzi scheme.  *See Scholes v. Lehmann*, 56 F.3d 750, 762 (7th Cir.) (the perpetrator's guilty plea established that his corporation's money consisted mostly of the proceeds from the fraudulent sale of limited partnership interests or the earnings on that money, he had no more than *de minimis* legitimate income, and virtually all of the money transferred to the defendant came directly or indirectly from the defrauded creditors

---

[11]    The Trustee also relies on the deposition testimony of Cherniak.  His testimony confirms that Solow did not authorize the issuance of the Solow Notes and that he did not sign them, two facts that appear to be beyond dispute.

of the perpetrator's corporations), *cert. denied*, 516 U.S. 1028 (1995); *Moran v. Goldfarb*, No. 09

Civ. 7667 (RJS), 2012 WL 2930210, at *4 (S.D.N.Y. July 16, 2012) ("[A]s noted above, Stein

admitted under oath to running a Ponzi scheme from 1998 through 2008."); *La Bella v. Bains*,

No. 10-cv-1760-BEN (WVG), 2012 WL 1976972, at *4 (S.D. Cal. May 31, 2012) (Ponzi

scheme operator admitted in guilty plea agreement the vehicle through which he ran his Ponzi

scheme did not conduct legitimate business and that he paid high returns to investors with new

investor money); *Armstrong*, 2010 WL 1141158, at *23 ("Yagalla testified that he ran a 'Ponzi

scheme' and that he ran the scheme '[f]rom the very beginning, in 1995.' [Citation omitted].  He

also repeatedly testified that he paid investors with the funds of other investors.").

In other cases cited by the Trustee, the defendants in the fraudulent transfer action

conceded or did not seriously dispute that the perpetrator operated a Ponzi scheme.  *See Warfield

v. Carnie*, Civ. A. No. 3:04-cv-633-R, 2007 WL 1112591, at *10 (N.D. Tex. April 13, 2007)

("The Danesi Defendants concede that RDI was operated as a Ponzi scheme, while the Carnies

Defendants all but concede the issue by not explicitly addressing it."); *Terry v. June*, 432 F.

Supp. 2d 635, 640 (W.D. Va. 2006) ("The Defendant does not contest the Receiver's argument

that Dowdell [the perpetrator] acted with actual intent fraudulent intent.  In fact, he appears to

concede the issue, acknowledging that Dowdell 'duped' investors into investing in Vavasseur . . .

Dowdell admits that Vavasseur never conducted any legitimate business, that it was insolvent

from its inception, and that the only source of funds to pay off early investors were the funds of

later investors."); *Picard v. Madoff (In re Bernard L. Madoff Inv. Secs. LLC)*, 458 B.R. 87, 104

(Bankr. S.D.N.Y. 2011) ("The breadth and notoriety of the Madoff Ponzi scheme leave no basis

for disputing the application of the Ponzi scheme presumption to the facts of this case,

particularly in light of Madoff's criminal admission.").

In *Christian Bros. High Sch. Endowment*, there was a much greater quantum of unrebutted evidence to support a determination that the perpetrator ran a Ponzi scheme. *Christian Bros.*, 439 B.R. at 305-06 (the perpetrators' guilty pleas together with an expert report showed that they (1) disseminated false information about the debtor's performance to its current clients to make it appear that the debtor was performing better than it was in order to induce new investors to invest in the debtor and existing investors to retain their investments, and (2) authorized redemption payments notwithstanding the inflated investor account statements and the debtor's insolvency to fulfill the investors' expectation and avoid an investigation).

Finally, the decision in *Donnell v. Kowell*, 533 F.3d 762 (9th Cir.), *cert. denied*, 555 U.S. 1047 (2008), did not explain the evidence on which the court relied. *Id.* at 772-73 (noting that the receiver filed his claim under actual fraud and constructive fraud theories, the district court did not identify under which theory it granted summary judgment although it cited actual fraud cases; the district court could have granted summary judgment under either theory, and based on a prior case involving the perpetrator, concluded that there was no triable issue of fact that the perpetrator ran a Ponzi scheme).

Here, the Trustee has not pointed to any similar admission or undisputed evidence and the defendants do not concede that Marc ran a Ponzi scheme. This does not mean that the Trustee cannot prevail at trial without such an admission or undisputed evidence, or that such evidence does not exist. In fact, the defendants' own submissions include evidence that Marc admitted to running a Ponzi scheme on several occasions. For example, he wrote to District Judge Rakoff prior to sentencing describing how he started stealing money mostly from clients in 2002 and eventually stumbled on the idea of the fraudulent note scheme. He spent most of the money on Dreier LLP but used much of the money to "service the 'debt' itself," he sold steeply

26

discounted notes when he "desperately needed new money to pay back loans becoming due," he

found himself "running a massive Ponzi scheme" and "[w]hen [he] was no longer able to pay off

old 'loans' to the real estate developer by creating new ones, [he] placed a few other fictitious

loans, in much the same manner, by using instead as the purported borrower a Toronto pension

fund." (*Green Declaration*, Ex. G10 at 2-3.)  The Trustee did not rely on this letter, and its

admissibility on the *Motions* is an open question.

Marc was questioned about the note fraud scheme and the letter to Judge Rakoff during a

deposition conducted in another adversary proceeding.  He testified that the sale of bogus

promissory notes could be characterized as a Ponzi scheme, and again admitted to running a

"massive Ponzi scheme" in which he used later lender money to pay off earlier lenders, and

confirmed that this was the "massive Ponzi scheme" that he mentioned in his letter to Judge

Rakoff.  (*Id.*, Ex G.6 at 79:12-80:14.)  He also testified that he commingled client funds with the

bogus note proceeds in Account 5966, but did not deposit Dreier LLP operating funds into that

account.  (*Id.*, Ex. G.6 at 85:4-20.)

The defendants in the Amaranth Proceeding and Westford Proceeding did not attend the

deposition or have the opportunity to question Marc.[12]  Furthermore, the Trustee argues that the

deposition is inadmissible and should not be considered, but if I do consider the deposition, I

should consider Marc's admission that he ran a Ponzi scheme..  (*Trustee's Supplemental*

---

[12]     I had previously approved the parties' joint motion to take Marc's deposition.  (*See Order Directing the
Deposition of Federal Prisoner Marc S. Dreier*, dated Feb.  27, 2012 (ECF Amaranth Doc. # 71); *Order Directing
the Deposition of Federal Prisoner Marc Dreier*, dated June 15, 2012 (ECF Amaranth Doc. # 83).)  However, the
Trustee's attorneys, who had first agreed to schedule Marc's deposition, apparently became frustrated dealing with
the prison officials and/or Marc.  They eventually advised the attorneys for Westford and Partners that they "will
attend his deposition if and when defense can arrange for it."  (*Declaration of Steven C. Bennett Regarding
Admissibility of Certain Documents Submitted on Trustee's Motion for Partial Summary Judgment*, dated Oct. 15,
2013, Ex. A (Email sent June 20, 2012 at 11:07 a.m.) (ECF Westford Doc. # 103).)  The deposition never went
forward.

*Memorandum of Law Submitted in Connection with the Court's September 16, 2013 Order*, dated Sept. 20, 2013, at 5-14 (ECF Amaranth Doc. # 101.)  Given that the defendants did not have the opportunity to attend the deposition and the Trustee's primary argument that the transcript is inadmissible, I will not consider Marc's deposition in deciding whether she has carried her burden on the *Motions*.

The only other evidence provided by the Trustee consisted of a plethora of bank and other records and documents depicting numerous transactions among the parties as well as evidence relating to notes purchased and payments made by other investors to Dreier LLP.  The parties disagree over the admissibility of these records, but even if they are admissible, they suffer from other glaring deficiencies.   First, the proof did not establish the missing element in the Trustee's case, to wit, that Marc was engaged in a general scheme to pay off previous investors with new investor money.  The Trustee dwelled exclusively on the transfers from Account 5966 to the defendants, and ignored transfers to the other investors.  In the Amaranth Proceeding, the proof showed, at most, that on one particular day in April 2006, Partners was paid with new investor money.  The Trustee did not attempt to show that other prior investors were paid with new investor money – Partners' or anyone else's – and a single incident does not establish a scheme.  The Westford Proceeding involved more examples indicating that a Fund was repaid at times with new investor money, but the evidence was sparse in light of the overall number of transactions between the Funds and Dreier LLP.  And again, the Trustee failed to show that any other investors were paid with new investor money.  As a result, and viewing each proceeding separately, the Court can at most infer in deciding the *Motions* that the defendants were sometimes paid with new investor money but not that Marc engaged in a general scheme to pay old investors with new investor money.

Second, the Trustee ignored a substantial number of transactions between the parties that she nevertheless included in computing her damages. Dreier LLP made seven transfers to Partners on six different days, but the Trustee only discussed two transfers made on one day. Similarly, Dreier LLP made 160 transfers to the Funds on 35 different days, but the Trustee's analysis only focused on 26 transfers made on six days. Yet the Trustee seeks to recover profits under the "net investment" approach which considers all of the transfers between the parties.[13] The Court cannot conclude based on the evidence presented on the *Motions* that these other transfers were made from new investor funds, or even whether Account 5966 was commingled with other investor funds on the dates of these transfers.

Third, the Trustee overlooked the source of the money transferred from Wachovia to Account 5966. According to the Trustee's proof, the Funds were repaid with substantial sums transferred into Account 5966 from Dreier LLP Wachovia accounts. The Trustee offered evidence that the Dreier LLP Wachovia accounts on occasion were funded with investor

---

[13]    The net investment method is used to determine the amount that the plaintiff may recover from a Ponzi scheme investor in fraudulent transfer litigation. *See In re Bernard L. Madoff Inv. Secs. LLC*, 654 F.3d 229, 234-35 (2d Cir. 2011); *SIPC v. Bernard L. Madoff Inv. Secs. LLC*, 476 B.R. 715, 729 (S.D.N.Y. 2012) (adopting the two-step approach set forth in *Donell v. Kowell*, 533 F.3d 762, 771-72 (9th Cir. 2008)); *accord Moran v. Goldfarb*, No. 09 Civ. 7667(RJS), 2012 WL 2930210, at * 4 (S.D.N.Y. July 16, 2012). While the net investment method has most often been applied in fraudulent transfer litigation brought by receivers appointed under the securities laws, its rationale applies to all Ponzi scheme fraudulent transfer litigation brought against "net winners":

> The rationale for a net investment approach is twofold. First, it is in the nature of a Ponzi scheme that customer returns are generated not from legitimate business activity but, rather, through the influx of resources from new customers . . . Second, recognizing claims to profits from an illegal financial scheme is contrary to public policy because it serves to legitimate the scheme.

*SEC v. Credit Bancorp, Ltd.*, No. 99 Civ. 11395 RWS, 2000 WL 1752979, at *40 (S.D.N.Y. Nov. 29, 2000).

    Once a Ponzi scheme has been established, application of the net investment method involves two-steps. *Donell,* 533 F.3d at 771; *SIPC v. Bernard L. Madoff Inv. Secs. LLC*, 476 B.R. at 729. First, the amounts transferred to the transferee during the course of the scheme are netted against the amounts invested at any time in the Ponzi scheme. Second, if the transfers to the defendant exceed the investment, the trustee may recover these net profits up to the amount transferred to the defendant within the applicable period of limitations. *See Donell*, 533 F.3d at 771; *SIPC v. Bernard L. Madoff Inv. Secs. LLC*, 476 B.R. at 729. If the investor acted in good faith, the amount of the recovery is limited to the net profit. *Donell*, 533 F.3d at 772.

proceeds, and implied that the outflow from Wachovia to Account 5966 always consisted entirely of the same investor proceeds. But the Trustee did not conduct an analysis or trace the flow of funds moving into and out of Wachovia or the sources of those funds. Consequently, the Court cannot infer for the purpose of deciding the *Motions* that the money transferred from Wachovia to Account 5966 and used to pay the Funds was derived in whole or in part from the sales of Solow Notes to other investors.

Fourth, as the defendants argued, the Trustee also failed to establish as a matter of law when the Ponzi scheme began. During his Allocution, Marc stated that the Ponzi scheme may have started as late as November 2004. Solow Notes 1 and 2 were issued before then, and some of the payments made on account of those notes were disbursed before November 2004, and arguably, before the Ponzi scheme started.

Fifth, and as noted in the background discussion, the Trustee's proof was sometimes incomplete or entirely missing. It appears that two days of bank records pertaining to April 2008 were missing. The Trustee stated that Epsilon Global II transferred two notes aggregating $6 million to Special Situations Master but did not provide evidence of the transfers and/or the instruction to pay the Special Situations Master. The Trustee identified numerous transfers to Account 3460 and Account 3720 but did not identify the owners of these accounts. The Trustee attributed certain deposits to Solow Note purchases, such as the Xerion note purchase on April 15, 2008, but did not supply the wire transfer records, as she did in other instances, showing that funds were actually wired by Xerion to Account 5966. In other cases, the amounts or dates of the "linked" transactions did not match and the Trustee did not explain the discrepancy.

30

Finally, the Trustee overlooked transactions that did not necessarily fit her theory. For example, one of the Westford Defendants wired $20 million into Account 5966 on December 29, 2006 to purchase the Series 6 Solow Notes. Immediately after the deposit, approximately $20 million was wired back out to the Funds. The Trustee disregarded the Funds' $20 million deposit, and instead, argued that the repayment to the Funds came from a Fortress investment made several days earlier.

For all of these reasons, the Trustee has failed to demonstrate as a matter of law that Marc ran a Ponzi scheme, or for that matter, that the transfers to the defendants were made in the course of a Ponzi scheme. Accordingly, the *Motions* are denied.

### D.    The Westford Cross-Motion

The Westford Defendants cross-moved for partial summary judgment on behalf of the SPEs, the Managers and Stevanovich arguing that they did not receive any of the transfers received by the Funds or benefit from those transfers. Pursuant to the *Agreed Stipulation*, the claims against the SPEs and Stevanovich were dismissed with prejudice.[14]  The Managers alone now press the *Cross-Motion*.

The material facts pertinent to the *Cross-Motion* are not disputed. The Managers essentially operate as a single entity, (*see Stevanovich Deposition* at 28:11-29:9), and act as investment advisors to the Funds. (*See Stevanovich Deposition* at 31:15-24; 34:19-35:15, 137:8-138:20.) The Managers managed the Funds, (*see id.* at 29:1-9), and the Funds paid the Managers two forms of compensation: (1) management fees based on 1.5% or 2% of a Fund's Net Asset Value ("NAV"), and (2) incentive fees based on 20% of the Funds' annual profits. (*See*

---

[14]        The *Agreed Stipulation* also dismissed the claims against Westford Special Situations Fund, Ltd.

*Stevanovich Deposition* at 46:6-19.)  The Managers were paid by the Funds, and the Trustee

concedes that they did not receive any transfers directly from Dreier LLP.  Furthermore, between

2004 and 2007, the Solow Notes never represented more than 3.5% of the Funds' total assets

under management.  (*Stevanovich Declaration* ¶ 8.)

   The issue on the *Cross-Motion* comes down to the question of whether the Trustee can

show that the Managers are subsequent transferees within the meaning of 11 U.S.C. § 550(a)(2).

In other words, did the Funds use any portion of the Solow Note proceeds to pay fees to the

Managers?  The Managers contend that the Trustee has failed to identify any evidence that the

Managers received any Solow Note proceeds because she did not do a tracing analysis to show

the flow of the Solow Note proceeds from Dreier LLP to the Funds and then to the Managers.

(*Westford Defendants' Memorandum of Law in Support of Motion for Partial Summary

Judgment*, dated Feb. 8, 2013, at 10 (ECF Westford Doc. # 77).)  Moreover, because the Solow

Notes never represented more than 3.5% of the Funds' total assets, there is "good reason to

believe" that tracing would not show that the Funds used Solow Note proceeds to pay the fees.

(*Id.*; *Stevanovich Declaration* ¶ 8 ("I expect that if a tracing analysis were conducted on proceeds

from the Solow Notes, it would likely reveal that proceeds from the Solow Notes were not used

to pay management fees to [the Managers] at all.").)

   The Managers' argument is counter-intuitive, and there is sufficient evidence in the

record to draw the reasonable inference that Funds used some of the Solow Note proceeds to pay

the Managers' fees.  *Picard v. Charles Ellerin Irrevocable Trust (In re Bernard L. Madoff Inv.

Secs. LLC)*, Adv. P. Nos. 10-04398 (BRL), 2012 WL 892514 (Bankr. S.D.N.Y Mar. 14, 2012)

illustrates why.  There, the chapter 7 trustee (Picard) sued the beneficiary of a trust (Winters) as a

subsequent transferee of fictitious profits paid by the debtor to the trust.  Winters moved for

32

summary judgment arguing that she had not received any money from the debtor and there was

no evidence to the contrary.  Picard countered that the trust's bank records showed that it had

received transfers from the debtor and subsequently transferred some of those funds to Winters.

*Id.* at *1.

The Court denied the motion.  After noting that it was required to draw all reasonable

inferences in favor of the non-moving party, the Court concluded that a reasonable fact-finder

could find that the funds received by Winters originated with the debtor.  *Id.* at *2.  The evidence

showed that the trust received funds from the debtor and Winters, a beneficiary, received funds

from the trust.  *Id.*  In addition, the trust's commingling of other property with the fraudulent,

fictitious profits did not defeat tracing, *id.*; *accord Universitas Educ., LLC v. Nova Group, Inc.*,

Nos. 11 Civ. 1590(LTS)(HBP), 2013 WL 6123104, at *12 (S.D.N.Y. Nov. 20, 2013), and at the

summary judgment stage, the chapter 7 trustee's burden "is not so onerous as to require 'dollar-

for-dollar accounting' of 'the exact funds' at issue."  *In re Bernard L. Madoff Inv. Secs. LLC*,

2012 WL 892514, at *3 (quoting *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*,

379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007) (citing *IBT Int'l, Inc. v. Northern (In re Int'l Admin.*

*Servs., Inc.)*, 408 F.3d 689, 708 (11th Cir. 2005)).

Here, the evidence supports the inference that the Funds transferred some portion of the

Solow Note proceeds to the Managers.  The Solow Note investments contributed to each Fund's

NAV and profits, and generated an obligation to pay fees to the Managers.  The Managers argue

that the Trustee failed to show that the Funds actually paid them any fees.  However, it is

reasonable to assume that the Funds satisfied their obligations to pay fees based on the Solow

Note investments, the Managers did not offer any evidence to show that the Funds did not pay

fees during the period they held the investments and received the profits, and the Trustee is not

33

required to perform dollar-for-dollar tracing at the summary judgment stage.[15]  Finally, the

Managers' speculation that tracing is "not likely" to reveal a subsequent transfer of Solow Note

proceeds hardly justifies granting the *Cross-Motion*.

The Managers have tried to distinguish *Bernard L. Madoff Inv. Secs. LLC* arguing that

the Court denied summary judgment because Picard had not had the chance to take discovery,

but here, discovery is completed.  (*Reply Memorandum of Law in Further Support of Westford*

*Defendants' Motion for Partial Summary Judgment*, dated Mar. 19, 2013, at 4-5 (ECF Westford

Doc. # 94).)  The *Madoff* court did state that summary judgment should be granted against a non-

moving party who has not had the opportunity to take discovery "only in the rarest of cases."

*Bernard L. Madoff Inv. Secs. LLC*, 2012 WL 892514, at *2 (quoting *Trammell v. Keane*, 338

F.3d 155, 161 n.2 (2d Cir. 2003) (quoting *Hellstrom v. U.S. Dep't of Veterans Affairs*, 201 F.3d

94, 97 (2d Cir. 2000)).  However, it denied summary judgment because the evidence showed that

there were disputed issues of material fact and Picard did not have to account dollar-for-dollar at

the summary judgment stage.  The same result follows in this proceeding for the reasons stated.

Accordingly, the *Cross-Motion* is denied.  Assuming that the Trustee can prove at trial

that Marc conducted a Ponzi scheme and caused Dreier LLP to make transfers to the Funds in

connection with the Ponzi scheme, the Trustee will then have the burden of tracing those

immediate transfers into the hands of the Managers as subsequent transferees.  *See In re Allou*

*Distribs.*, 379 B.R. at 30; *In re Int'l Admin. Servs.*, 408 F.3d at 708.  The burden is not

---

[15]     According to the Managers, the Solow Notes represented no more than 3.5% of the Funds' investments from 2004 through 2007.  The profitable Solow Note investments may nonetheless have accounted for a greater proportion of the cash received by the Funds and used to pay the Managers' fees.  In addition, the Managers did not identify what portions of the Funds' NAVs (or profits) were attributable to the Solow Notes in 2008 when the Funds still held substantial investments.

necessarily an easy one, and the Trustee may fail to meet it or decide that the cost of trying

outweighs any possible benefit.  But it is premature to cut her off at this stage of the proceeding.

  The parties are directed to settle an order on notice and schedule a conference to discuss

further proceedings and schedule a trial.

Dated: New York, New York
   January 2, 2014

      /s/ *Stuart M. Bernstein*
      STUART M. BERNSTEIN
    United States Bankruptcy Judge